# Georgia Life Insurance Company *v.* Easter.

## *Assumpsit.*

(Decided November 7, 1914.   66 South. 514.)

1. *Insurance; Accident; Risk Insured Against; Death While Traveling in Conveyance of Common Carrier.*—The facts considered and it is held that in determining whether the hiring company was a common carrier it was immaterial that its wagons in question were not hired to negroes, as the segregation of the races finds sanction not only in the best thought of both races, but also in statutes requiring their separation, and a carrier's discrimination against one race in violation of law cannot affect his relation to the public.

2. *Same.*—A common carrier is one who undertakes for a reward to carry indiscriminately, passengers or baggage so long as there is room, and the fact that the company may have been a common carrier with respect to its transfer business did not render it a common carrier with respect to its picnic wagons, but it was as to them a mere private carrier for hire.

3. *Carriers; Liveryman.*—A liveryman is not a common carrier.

APPEAL from Birmingham City Court.

Heard before Hon. JOHN H. MILLER.

Action by Martin L. Easter, as administrator of the estate of Margaret Easter, against the George Life Insurance Company of Macon Georgia, for the amount of the policy issued on the life of his intestate, whose death is alleged to have been caused independently and exclusively of all other causes through external, vio-

[Georgia Life Insurance Company v. Easter.]

lent, and accidental means, while a passenger in or on a public conveyance provided by a common carrier for passenger service. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

The policy is set out as a part of the complaint. The defense set up by the special plea is that it was a part and parcel of the policy or contract that intestate should be riding as a passenger in or on a public conveyance provided by a common carrier for passenger service, and defendant avers that at the time said intestate lost her life she was not riding in or on a public conveyance provided by a common carrier for passenger service.

CHARLES A. CALHOUN, for appellant.

ALVIN M. DOUGLASS, HALEY & HALEY, and T. M. BRADLEY, JR., for appellee.

DE GRAFFENRIED, J.—The following excerpts from the testimony of some of the witnesses will place the reader in possession of the facts:

"I am connected with the Harris Transfer & Warehouse Company. My position is president and general manager. It is a corporation. We keep the following picnic wagons for hire: I think, let's see, there are two tallyhos, park wagonette; there about five. You see we use our horses indiscriminately. We use in that kind of business a number of horses; that is, just according to the number of wagons that are out. We could put four horses to each wagon. The company has been in that business since 1880 in the city. I couldn't really say approximately how many trips out we make a year. We don't rent these picnic wagons to negroes.  *   *   *  Our business at that time with reference to passengers

\* \* \* was that we sent out picnic parties. \* \* \* We furnished picnic wagons, driver and horses, and harness for the horses to pull the wagon by, the whole equipment for carrying the crowd, except something to eat and drink, of course, and charged for it. If we knew that the people were going to abuse the horses or the wagons or anything like that, we wouldn't rent them out to white people. I don't know of any case, but if we actually knew it, I don't think that we would actually rent them out. We have stables here in Birmingham. We have wagons, picnic wagons, and other kinds of wagons. From time to time people apply there for a wogan for one purpose or another, and we hire them out to them, and among those wagons we have picnic wagons that we hire to parties from time to time. As a matter of fact, when we hire a picnic wagon, some one of the party comes to me or to some representative of mine and makes a trade with me as to where they are going, how far they are going, and as to what the charge, what the amount of the hire shall be, and that is especially arranged with each party, with reference to the distance they are going or where they are going, and one thing and another."

"I was in the employ of the Harris Transfer & Warehouse Company at the time that this rig was hired. I rented that rig to Mr. Henry. I waited on him. I don't know whether he had any one with him when he came to me about it or not, but he is the one that transacted the business, he arranged for it, he engaged it for this date, to take a picnic to Mt. Pinson, and ordered it to be at a certain place at a certain hour. We furnished a driver, and turned that rig entirely over to them for that entire day, to use for the purpose of carrying this picnic party. We did not rent those particular picnic wagons to negroes. We have some other

wagons we usually arrange for negroes when they want them; common wagons, you know, straw seats in them to accommodate them. So far as these wagons were concerned, we only rented those to white people. Usually the terms for renting those wagons are stated, and that would be the only question ordinarily as to whether they accepted the terms or not. The amount would be stated and they would take it if they wanted it. It was optional with us as to who we should rent those wagons to, what persons; I don't know of any occasion there would be to let anybody have it, you know, except negroes. We would not let out a wagon in case we thought there would be any chance for any damages to the outfit. We wouldn't rent it to that kind of a person, whether he was white or black. We would not rent these wagons, these particular picnic wagons, to people except white people anyhow.

"We had some wagons fitted up for negroes and let them have them. As a matter of fact, the Harris Transfer & Warehouse Company didn't turn down people that wanted picnic wagons. They paid me $15, and I was to furnish a tallyho, that conveyance there, four-wheeled conveyance, and four horses and the harness and the driver, and I was to deliver it at a certain point, and they were to select the crowd, they arranged their own crowd, the picnic. It was for that day, it was understood they were to put—I had nothing to do with the selection of the passengers. The understanding was they were to go to Mt. Pinson; we fed the team, and they paid us $15 for it. Any other picnic crowd that wanted to go there could have done the same thing. We had the same price for all parties, for the same place and same time and equipment and for the same wagon. We were regularly engaged in that business

and been engaged in it for years. We keep wagons for that purpose and let them out on special occasions.

"We wouldn't let those wagons out except to persons we considered would take care of the equipment. We determined who we would rent these wagons to when they came to us and applied to us. We determined whether we would do it or whether we would not, but I don't know of any cases that we turned down re- putable looking people that would come and inquire for it. I don't remember of ever turning down a pic- nic party unless they wouldn't pay the price we asked for it. We would make the price, ourselves. It was determined in every instance what the price would be and unless they paid that price we wouldn't let them have it at all under any circumstances."

"I have been secretary of the Harris Transfer & Warehouse Company since its organization, since its incorporation. They do a general warehouse, storage, and transfer business of freight principally, and also have a number of wagons which they advertise to hire for picnic purposes and the transfer 'of passengers. They also have two automobiles which are applicable to either the transfer of freight or the handling of pas- sengers. The original business was established in 1880; the company was incorporated in 1901. I am secre- tary of the company and have been for 12 years. Prac- tically all, well 75 per cent., of our business is the haul- ing of freight, possibly a larger percentage. In ad- dition to that, we do a storage business. We have a stable, and also have a shop. It is entirely optional with the Harris Transfer Company as to whom we shall rent these wagons to."

1. The plaintiff's intestate while on the picnic party referred to above accidentally fell from the picnic wa- gon and was killed, and the sole question is: Was the

plaintiff's intestate, at the time of her death, "a passenger in or on a public conveyance provided by a common carrier for passenger service?" In this connection we desire to say that we are not inclined to permit the fact that the five picnic wagons referred to in the above testimony were kept exclusively for the use of white picnic parties to in any way influence our decision. The Warehouse & Transfer Company provided other means of transportation for negro picnic parties and the necessity for the segregation of the white and black races in the state is so great that it finds sanction not only in the best thought of all those—both white and black—who have the true interest of the two races in mind, but it has also found expression in many statutes requiring common carriers upon equal and just terms to keep the members of the two races separated while they travel. If a common carrier violates the spirit or the letter of the law and in the matter of the character of the conveyance discriminates against one of the races in favor of the other, his violation of the law can in no way affect the relations which, as a matter of fact, he bears to the public as a common carrier. —*Lloyd v. Haugh & Keenan Storage & Transfer Co.,* 223 Pa. 148, 72 Atl. 516, s. c., 21 L. R. A. (N. S.) 188. The members of each race—white and black—have a claim upon a common carrier for equal accommodations while they travel. The members of neither race have, in this state, the right to demand that they be permitted to travel in a conveyance kept exclusively for the other race, but they have a right to demand that the conveyance which is kept for them shall be equal, in point of accommodation, to that kept for the members of the other race. The laws of hygiene, common sense, and necessity dictate this rule of the law. Necessity frequently fixes a rule of law where, in

the absence of necessity, no such rule would exist.—
*Waldrop v. N., C. & St. L. Ry.* 183 Ala. 226, 62 South.
769.

2. In the case of *Nugent v. Smith,* L. R. 1 Common
Pleas Div. 19 and 423, which case appears in a note,
section 49, 1 Hutchinson on Carriers (3d Ed.) p. 44,
we find the following: "The real test whether a man
is a common carrier, whether by land or water, there-
fore, really is whether he has held out that he will,
so long as he has room, carry for hire the goods of every
person who will bring goods to him to be carried. The
test is not whether he is carrying as a public employ-
ment or whether he carries to a fixed place, but whether
he holds out, either expressly or by a course of conduct,
that he will carry for hire, so long as he had room, the
goods of all persons indifferently who send him goods
to be carried."

Under this rule a stagecoach, a bus, an automobile,
or a hackney coach, a cab, dray, cart, wagon, or sled,
which undertakes for a reward to carry, indiscrimi-
nately, passengers or baggage for the public "so long
as there is room," is a common carrier.—Hutchinson
on Carriers (3d Ed.) vol. 1, p. 63, § 68.

A few illustrations may drive home the above rule.
There is a regular automobile line which runs to and
from the city of Montgomery to Eclectic, and in any
automobile of this line any person, so long as there is
room, may take passage upon the payment of his fare.
This automobile line is, of course, a common carrier
of passengers. There are in the city of Greensboro,
hacks, carriages, and automobiles which carry passen-
gers from the station there to any part of that city,
and they take these passengers so long as there is room.
These hacks, carriages, and automobiles, when engaged
in the above business, are common carriers. During

the county fair in Greensboro, there are hacks, automobiles, and carriages, which, so long as there is room, carry, for hire, passengers to and from the county fair grounds. When so engaged, these hacks, carriages, and automobiles are common carriers. Any decent members of the public has a right, so long as there is room for him in any hack, automobile or carriage to demand that he be permitted to ride in it.

3. Accepted as true all the evidence in this case, and allowing reasonable intendments favorable to the plaintiff which can be drawn therefrom, the Harris Transfer & Warehouse Company may have been—and probably was—a common carrier of freight and passengers in so far as its transfer business was concerned, but it was not a common carrier in so far as this specific picnic business was concerned. If this testimony is to be believed, then this transfer company occupied the same relation to the public with reference to picnics that an ordinary livery stable keeper occupies to the public. It is evident that, at the period of the year when people are accustomed to avoid the heat of cities and find recreation in the country, private picnics are of frequent occurrence in the neighborhood of the city of Birmingham, and, to meet this want of the people, the transfer company has provided itself with some extra large wagons for use on such occasions. These picnic wagons are hired out just as the ordinary liveryman hires out his teams. The liveryman keeps his teams for hire to meet a want of the people, just as this transfer company keeps its picnic wagons to meet a want of the people. The picnic wagons have simply been provided to meet the requirements of larger parties than can be accommodated in the hacks and carriages ordinarily in use. The mere fact that a liveryman may be engaged in one line of business as a com-

mon carriers does not render him a common carrier as to his livery business. His hack when hauling passengers from a station may be a common carrier, and that same hack when it is carrying a traveling man from one town to another town may not be a common carrier. In the one instance the passenger has the legal right to demand passage. In the other instance the traveler has no legal right to make such demand.

4. That a liveryman is not a common carrier there is, under all the authorities, no doubt.—*Stanley v. Steele,* 77 Conn. 688, 60 Atl. 640, 69 L. R. A. 561, 2 Ann. Cas. 342; *Payne v. Halstead,* 44 Ill. App. 97; *Siegrist v. Arnot,* 86 Mo. 200, 56 Am. Rep. 424; 26 Cyc. p. 1513; 1 Hutch. on Carriers (3d Ed.) p. 92, § 96.

5. It is laid down in the books that, as a general proposition, the question as to whether a particular man is or is not a common carrier is a mixed question of law and fact. It is undoubtedly true, as stated by counsel for appellee in their briefs, that: "What constitutes a common carrier is a question of law, but whether a party comes within that meaning is a question of fact."

In this case, under the law, the facts show that, in the particular business in which this transfer company was engaged when the plaintiff's intestate was killed, it was not a common carrier, but only a private carrier for hire.

6. In the above discussion we have not undertaken to give the reasons which have actuated the courts in holding that a liveryman, who keeps vehicles, horses, and drivers, for hire, is not a common carrier. The reasons appear in the above authorities, and it is needless to republish them here.

In this case the plaintiff's intestate was killed in falling from a wagon which some of her friends had hired

for their own private use on that day. As she was not killed "while a passenger in or on a public conveyance provided by a common carrier for passenger service," the defendant was entitled to affirmative instructions in its behalf. Justice to the defendant, under the law, makes this demand for it contracted under its policy, not against accidents occurring while the plaintiff's intestate was the occupant of a vehicle hired from one who occupied to her the character of a livery stable keeper and who owed, to her, only the duties of a livery stable keeper, but only against an accident which she might receive while under the protection of a common carrier who owed to her the high duties which a common carrier owes to a passenger.—1 Hutch. on Carriers (3d Ed.) p. 92, § 96.

Reversed and remanded.

ANDERSON, C. J., and MCCLELLAN and MAYFIELD, JJ., concur.