RALPH C. RODGERS, APPELLANT, V. NEBRASKA STATE RAIL-
WAY COMMISSION, APPELLEE.

279 N. W. 800

FILED MAY 27, 1938.   No. 30348.

*Beghtol, Foe & Rankin* and *Allen, Requartte & Wood,* for appellant.

*Richard C. Hunter, Attorney General,* and *Edwin Vail, contra.*

Heard before GOSS, C. J., EBERLY, DAY, PAINE, CARTER and MESSMORE, JJ.

MESSMORE, J.

This is an appeal from a decision of the state railway commission of Nebraska, in which the commission denied the appellant an exemption as contended for by him under Legislative Bill No. 178, passed by the 1937 session of the unicameral legislature. Laws 1937, ch. 142. The facts are not in dispute.

The appellant made application on August 24, 1936, to the state railway commission for a certificate of public convenience and necessity to operate as a common carrier of property by a motor vehicle under resolution 141 of the state railway commission, prior to the time Legislative Bill No. 178 became effective on August 16, 1937. Without appellant filing another application, the application so filed was recognized by the commission as effective under

the Nebraska motor carrier act of 1937, that is, Legislative Bill No. 178, and the ruling of the commission was made in connection with the administration of said act. Appellant described the route regularly operated by him in his own right as of April 1, 1936, the territory served, from Milford 15 miles north, 20 miles west, 20 miles south, and 7 miles east, and delivery made to Lincoln. He has five trucks each of which is insured from $5,000 to $10,000 for public liability, and $5,000 for property damage, and recognizes his legal obligation for the cargo which he hauls. The appellant is engaged in picking up cream and milk only. At times he solicits the farmers for the privilege of hauling their milk and cream, and at other times farmers come to him, requesting him to haul milk and cream for them. The milk and cream so hauled is hauled from the farms of his respective customers to the Roberts Dairy and Beatrice Creamery companies in Lincoln, where the milk and cream are weighed in, the farmers credited with the amount, and the appellant paid twice each month by the dairy and creamery. The title to the milk and cream remains in the farmers until such time as delivery is made to the dairy and creamery. The appellant returns the empty cans to the farms. He does not transport any other commodity than milk and cream as aforesaid and in the manner described.

The first question for our consideration is: What is meant by agricultural commodities?

In the case of *District of Columbia v. Oyster*, 4 Mackey (D. C.) 285, 54 Am. Rep. 275, in the body of the opinion the court said (p. 286):

"But the common parlance of the country, and the common practice of the country, have been to consider all those things as farming products or agricultural products which had the *situs* of their production upon the farm, and which were brought into condition for the uses of society by the labor of those engaged in agricultural pursuits, as contradistinguished from manufacturing and other industrial pursuits.

"The product of the dairy or the product of the poultry

yard, while it does not come directly out of the soil, is necessarily connected with the soil and with those who are engaged in the culture of the soil. It is, in every sense of the word, a part of the farm product. It is depended upon and looked upon as one of the results and one of the means of income of the farm, and in a just sense, therefore, it may be considered produce."

In 2 Am. Jur. 395, sec. 2, speaking of agriculture, it is said: "The term is broader in meaning than 'farming;' and while it includes the preparation of soil, the planting of seeds, the raising and harvesting of crops, and all their incidents, it also includes * * * dairying." To like effect are *Gregg v. Mitchell,* 166 Fed. 725; *Dillard v. Webb,* 55 Ala. 468.

In the Non-Stock Cooperative Marketing Act (Comp. St. 1929, sec. 24-1401), the Nebraska legislature of 1925 defined the term "agricultural products" as "field crops, horticultural, viticultural, forestry, nut, dairy, live stock, poultry, bee and farm products." Decisions of the courts have adopted the foregoing definition of agricultural commodities or products. We believe that the applicant in this case was engaged in hauling agricultural commodities. This brings us to the question of whether or not the applicant is a common carrier or a contract carrier.

The term "contract carrier" was unknown to the common law, and is to be found in comparatively recent statutory enactments. The common law recognizes but two classes of carriers, viz., common carriers and private carriers.

The appellee contends that the applicant in this case is a common carrier, subject to regulation by the railway commission under section 20, art. IV of the Constitution, which in part follows: "The powers and duties of such commission shall include the regulation of rates, service and general control of common carriers as the legislature may provide by law. But, in the absence of specific legislation, the commission shall exercise the powers and perform the duties enumerated in this provision."

Section 4 of Legislative Bill No. 178 (Laws 1937, ch.

142) follows: "Jurisdiction is hereby conferred upon and vested in the Commission, and it shall be its duty: (a) To regulate common carriers by motor vehicle as provided in this Act, and to that end the Commission may establish reasonable requirements with respect to continuous and adequate service, transportation of baggage and express, uniform system of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment. (b) To regulate contract carriers by motor vehicle as provided in this Act, and to that end the Commission may establish reasonable requirements with respect to uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment."

Section 2 of Legislative Bill No. 178 (Laws 1937, ch. 142) provides as follows: "(i) The term 'common carrier' means any person who or which undertakes to transport passengers or property for the general public in intrastate commerce by motor vehicle for hire, whether over regular or irregular routes, upon the highways of this state. (j) The term 'contract carrier' means any motor carrier transporting passengers or property for hire other than as a common carrier."

Appellee cites 10 C. J. 37, as follows: "While a common carrier has been defined as one that holds itself out to the public to carry persons or freight for hire, the term did not, at the common law, embrace a carrier of passengers, and is commonly confined to carriers of goods, as distinguished from common carriers of passengers. A common carrier differs from a private carrier in two important respects: (1) In respect of duty, it being obliged by law to undertake the charge of transportation, which none but a common carrier, without a special agreement, is. (2) In respect of risk, the former being regarded by the law as an insurer, the latter being liable like ordinary bailees."

Appellee cites *Terminal Taxicab Co. v. Kutz*, 241 U. S. 252, particularly that part of the opinion in which it was

pointed out that a taxicab company had an exclusive contract with a hotel to maintain sufficient taxicabs to be used by the guests of the hotel. The taxicab company claimed it was not a common carrier. The court held the taxicab company to be a common carrier; that the business engaged in by the company, in so far as the hotel was concerned, was of a public nature to such extent that the company would be obligated to haul other persons than guests of the hotel upon demand. This case is cited upon the principle that a carrier may be engaged in hauling one commodity and be a common carrier.

Appellee also cites Interstate Commerce, in Ex parte No. MC-12, Motor Carrier Cases, 1 I. C. C. Rep. 628, as follows: "Contract carriage is a form of private carriage, as distinguished from the carriage for the general public which common carriers hold themselves out to perform. That the business of common carriers is a public calling and subject as such to public regulation has long been recognized. It has become evident, particularly in the motor-carrier field, that private carriage also is sufficiently affected with a public interest to warrant public regulation, at least to an extent. The term 'contract carrier' was coined in state statutes for the regulation of motor carriers."

The applicant cites *Cushing v. White,* 172 Pac. 229 (101 Wash. 172) in which the court defined "common carrier" as follows: "A common carrier is one whose occupation is transportation of persons or things from place to place for hire or reward, and who holds himself out to the world as ready and willing to serve the public indifferently in the particular line or department in which he is engaged; the true test being whether the given undertaking is a part of the business engaged in by the carrier, which he has held out to the general public as his occupation, rather than the quantity or extent of the business actually transacted, or the number and character of the conveyances used in the employment." The opinion gives an exhaustive review of definitions of the term "common carrier."

In the case of *Georgia Life Ins. Co. v. Easter*, 189 Ala. 472, 66 So. 514, the following definition is given: "The real test whether a man is a common carrier, whether by land or water, therefore, really is whether he has held out that he will, so long as he has room, carry for hire the goods of every person who will bring goods to him to be carried."

In *Hogan v. Nashville Interurban R. Co.*, 131 Tenn. 244, 174 S. W. 1118, the court gave the following definition (p. 254) : "The true test of the character of a party, as to whether he is a common carrier or not, is his legal duty and obligation with reference to transportation. Is it optional with him whether he will or will not carry; or must he carry for all? If it be his legal duty to carry for all alike, then he is subject to all those stringent rules which, for wise ends, have long since been adopted and uniformly enforced, both in England and all the states, upon common carriers." There are many decisions from the different states of like import.

In the case of *Dairymen's Cooperative Sales Ass'n v. Public Service Commission*, 98 A. L. R. 218 (115 Pa. Super. Ct. 100) it was held: "One engaging in the transportation, for members of a dairymen's cooperative association, of milk consigned by them to the association for sale, is not shown to be a common carrier and as such required to obtain a certificate of public convenience, by evidence that he solicited, at the request of the association, certain persons who were members of the association to sign a hauler's agreement, and that he called on a number of them to ascertain whether the milk would be delivered to him before the hauler's contracts were signed."

In *Public Utilities Commission v. Holdren*, 34 Ohio App. 416, 171 N. E. 255, it was held: "Truck owners, not holding themselves out as willing to serve the public indiscriminately, but hauling produce of their own and other farms only under private contracts, including one with a producers' association, which was not shown to be a common carrier and expressly stipulated in contract that no

goods should be hauled except as directed by it, held not common carriers."

Analyzing the facts in the instant case with the decisions of the courts on this proposition of law, we believe that the applicant is, for all intents and purposes, a contract carrier, within the meaning of Legislative Bill No. 178.

This brings us to the question of the exemption claimed by the applicant under subdivision (d), sec. 3, Legislative Bill No. 178 (Laws 1937, ch. 142). Said subdivision, in part, follows: "No provision of this Act or order of the Commission shall apply * * * to motor vehicles used exclusively in carrying for hire live stock or agricultural commodities or other commodities used in the production of agricultural products to and from any farm or ranch."

Appellee relies upon the case of *Smith v. Cahoon*, 283 U. S. 553, wherein the court held: "A state statutory provision which requires those who operate motor vehicles on the highways in the transportation of goods for hire to furnish a bond or insurance policy for the protection of the public against injuries received through negligence in such operation, but which does not apply to those 'engaged exclusively in the transporting agricultural, horticultural, dairy or other farm products and fresh and salt fish and oysters and shrimp from the point of production to the assembling or shipping point en route to primary market, or to motor vehicles used exclusively in transporting or delivering dairy products,' *held* repugnant to the equal protection clause of the Fourteenth Amendment." The opinion recognized the principle that the state has a broad discretion and classification in the exercise of its power to regulate, but declared that the discrimination was unreasonable and arbitrary. Appellee's contention is that the decision in the above case has never been departed from.

In the case of *Continental Baking Co. v. Woodring*, 286 U. S. 352, decided May 23, 1932, the court had under consideration the Kansas motor vehicle law of 1931, which imposed a tax on motor vehicles on the basis of gross ton

miles. There was an exemption in the statute which applied to the transportation of live stock and farm products to market by the owner thereof or supplies for his use in his motor vehicle. Among other things the court held:

"The provision in the Kansas Motor Vehicle Act that it shall not apply to 'the transportation of live stock and farm products to market by the owner thereof or supplies for his own use in his own motor vehicle,' is likewise based on permissible classification.

"The legislature in making its classification was entitled to consider frequency and character of use and to adapt its regulations to the classes of operations which by reason of their habitual and constant use of the highways brought about the conditions making regulation imperative and created the necessity for the imposition of a tax for maintenance and reconstruction." In the opinion it was said (p. 372):

"The statute does not attempt to impose an arbitrary discrimination between carriers who transport property for hire, or compensation, with respect to the class of products they carry. The exemption runs only to one who is carrying his own live stock and farm products to market or supplies for his own use in his own motor vehicle," distinguishing that case from *Smith v. Cahoon, supra.*

In *Hicklin v. Coney,* 290 U. S. 169, decided December 4, 1933, the supreme court had under consideration a regulatory act of South Carolina affecting transportation by motor vehicles. The act contained a provision exempting farmers and dairymen hauling dairy or farm products. Among other things the supreme court of the United States held: "The equal protection clause of the Fourteenth Amendment does not forbid discriminations in a state statute whereby those who use the state highways in the regular business of transporting goods for hire are brought under regulations which do not apply (a) to persons whose chief business is farming or dairying and who, occasionally and not as a regular business, haul farm and dairy products for compensation; and (b) to lumber haulers en-

gaged in transporting lumber or logs from the forests to the shipping points." The above case was distinguished from *Smith v. Cahoon, supra,* in that in the latter case the statute under consideration applied to all carriers for compensation over regular routes, and exempted any transportation company exclusively engaged in the transportation of agricultural, horticultural, dairy or other farm products, fresh and salt fish, etc., from the point of production to the assembling or shipping point en route to primary markets or to motor vehicles used exclusively in transporting and delivering dairy products. The court in *Hicklin v. Coney, supra,* said (p. 176) : "Upon the present record, it appears that the exemption is applied with two limitations, *first,* that, as construed by the state court, it can refer only 'to one whose principal business is that of a farmer or dairyman and not to one merely incidentally engaged in farming or dairying,' and, *second,* under the construction of the Commission in enforcing the statute—a construction not disapproved by the state court—that it applies only to farmers and dairymen who occasionally, and not as a regular business, transport farm or dairy products for compensation. We cannot say that a classification based on such a use of the highways is an arbitrary one and thus encounters constitutional objection."

The last expression by the supreme court of the United States on the subject is found in the case of *Aero Mayflower Transit Co. v. Georgia Public Service Commission,* 295 U. S. 285, decided April 29, 1935. The court held: "A Georgia statute * * * imposing an annual license tax on private carriers by motor vehicle of $25 per vehicle using the state highways, the proceeds of which tax are applied to the upkeep of state highways, does not violate the equal protection clause of the Fourteenth Amendment by exempting: * * * Vehicles engaged exclusively in the transportation of agricultural or dairy products, whether the 'vehicle is owned by the owner or producer of such agricultural or dairy products or not, so long as the title remains in the producer.' " It was further held:

"A state legislature has a wide discretion in the classification of trades and occupations for the purpose of taxation and in the allowance of exemptions and deductions within reasonable limits.

"Exemption of private carriers of farm and dairy products from a tax, though one imposed for highway upkeep, stands on a different footing from an exemption from a general requirement that private carriers provide bonds to insure the safety of the public on the highways."

Other cases are cited but we deem the foregoing the pertinent and leading cases on the subject.

In the case of *Aero Mayflower Transit Co. v. Georgia Public Service Commission, supra,* appellee contends the court was dealing with an exemption from taxation, which distinguished the situation thus presented from that presented in *Smith v. Cahoon, supra,* where the exemption was from the general regulatory provisions of the act. While the court upheld the exemption, so far as the tax was concerned, it expressed no opinion as to the validity of the exemption regarding regulatory provisions.

We see no particular merit in the above distinction, in view of other statutory regulations in our law governing the operation of motor vehicles over the highways of this state, and to which the applicant is subject. Other cases cited do not disclose whether there are other pertinent provisions of the statutory law that relate to carriers in such cases. The fee designated under Legislative Bill No. 178 is used for administrative purposes, as applied to the instant case. Comp. St. Supp. 1937, sec. 75-226. In the case of *Smith v. Cahoon, supra,* the carrier involved was a common carrier and the statute provided for the placing of a bond or insurance policy by the carrier, to provide against negligence of such carrier in operating his vehicle upon the highways of the state. In other cases cited and analyzed, the fee charged to the carrier was used for the construction and maintenance of the highways of the states.

*Aero Mayflower Transit Co. v. Georgia Public Service Commission, supra,* in many respects, referring to the

facts and the law, is analogous to the case at bar and decisive of the issues as presented in the instant case, with the distinction as heretofore set out. In the instant case, the services of the applicant are not available to the public generally. He does not hold himself ready to serve the public indefinitely. He does not hold himself out to haul any other commodity of any kind or nature, and reserves the right to haul only milk and cream to a designated market, to wit, a dairy and creamery, and to haul the empty cans from the dairy and creamery back to the respective farms. The service which he renders is service done according to private contracts with a group of farmers. No one else is interested and no benefit or disadvantage, by reason of the contract, accrues to any one else. He travels over roads which it is impossible for railroads to reach. He renders a service at a minimum cost to the farmers whom he serves. Even though the regulatory fee which he may pay under Legislative Bill No. 178 (Comp. St. Supp. 1937, sec. 75-226) is apparently small, yet it is well known that if the applicant be forced to pay this fee the ultimate cost will fall on the farmers whom he serves. Taking into consideration the period of drouth over the last five or six years, the evident intention of the legislature in granting this exemption, under the provisions of the section referred to, was to relieve the farmers of this state of a burden, well knowing that commodities, such as milk and cream, constituted during this period a farmer's living. It would seem that this exemption is a reasonable and fair exemption, not arbitrary, and, in view of the authorities, most of which recognize this broad principle of law as to the right of the legislature to make a reasonable and fair classification, it should be granted. We therefore believe that the applicant is entitled to the exemption as contained in subdivision (d), sec. 3, ch. 142, Laws 1937 (Comp. St. Supp. 1937, sec. 75-224).

The railway commission derives jurisdiction over common carriers and the right to regulate such carriers under section 20, art. IV of the Constitution. The commission has been given the power to provide what routes must be

followed and what construction shall be adopted with reference to telephone lines, lines transmitting electrical energy for the purpose of providing electric current (Comp. St. 1929, sec. 86-305) ; the power to regulate the issuance of securities of all public utility companies (Comp. St. 1929, sec. 75-1201) ; the power to regulate rates and charges of private irrigation companies (Comp. St. 1929, sec. 46-627) ; the power to regulate construction and operation of pipe lines for the transmission of oil and gas (Comp. St. 1929, sec. 75-1101) ; the power to regulate both public grain warehouses (Comp. St. Supp. 1937, sec. 88-219) and the warehousing of grain upon the farm (Comp. St. Supp. 1937, sec. 88-320), and the power to conduct tests as to farm tractors (Comp. St. 1929, sec. 75-901).

The foregoing provisions of the Nebraska statutes are cited, showing the delegated powers granted to the railway commission by the legislature of this state and the extension of such powers and duties which have not been challenged in the courts. We have heretofore set out the powers granted to the railway commission, as disclosed by section 20, art. IV of the Constitution of this state. In addition to the constitutional and statutory powers delegated to the railway commission, we find expression in the case of *In re Yellow Cab & Baggage Co.*, 126 Neb. 138, 253 N. W. 80, as to the extensiveness of the delegated power to the railway commission by the constitutional provision over common carriers (Const. art. IV, sec. 20). The proposition of law announced in the above case is that the plenary power of the railway commission may only be curtailed or diminished where the legislature has, by specific legislation, occupied the field.

In *Stephenson v. Binford*, 53 Fed. (2d) 509, the court said (p. 515) : "We think that, if a state determines that the business of common carriage by rail and road may no longer, from the standpoint of public interest, be looked upon as a business entirely separate and distinct from that of contract carriers by road, that all of its available carriage services are so bound together and so interdependent that

the public may not continue to have a safe and dependable system of transportation unless private carriers operating on the same roads with common carriers are brought under just and reasonable regulations, bringing their services into relation with those of common carriers thereon, no just or valid reason exists why it may not do so." The decision in the above case was substantially upheld by the supreme court of the United States. *Stephenson v. Binford*, 287 U. S. 251.

In section 1 of Legislative Bill No. 178 (Laws 1937, ch. 142) it was "declared to be the policy of the Legislature to regulate transportation by motor carriers in intrastate commerce upon the public highways of Nebraska in such manner as to recognize and preserve the inherent advantages of, and foster sound economic conditions in, such transportation and among such carriers in the public interest; promote adequate, economical and efficient service by motor carriers, and reasonable charges therefor, without unjust discrimination, undue preferences or advantages, and unfair or destructive competitive practices; improve the relations between, and coordinate transportation by and regulation of, motor carriers and other carriers; develop and preserve a highway transportation system properly adapted to the needs of the commerce of Nebraska; cooperate with the several states and the duly authorized officials thereof; and cooperate with the Interstate Commerce Commission in the administration and enforcement of the federal 'Motor Carrier Act, 1935,' approved by the President on August 9, 1935. The Legislature declares that all of the available carriage service, including common carriage by rail and road and contract carriage by road, are so interdependent that the public may not continue to have a safe and dependable transportation system unless contract carriers operating on the same roads with common carriers are brought under just and reasonable regulations bringing their service into relation with common carriers."

The section above quoted meets exactly the proposition of law as laid down in *Stephenson v. Binford, supra,* and

uses the exact language, in part, as stated in the opinion in that case. We believe that, under the authorities as herein stated, the provisions of Legislative Bill No. 178 herein discussed are not arbitrary or unreasonable; that common carriers and contract carriers are so closely allied as to be interdependent, and that the subject is a fit and proper subject for action by the legislature.

We are of the opinion that Legislative Bill No. 178 is constitutional in granting the right to the railway commission to regulate contract carriers, as provided in the act, and that the exemption contained in subdivision (d), sec. 3 of the act, upon which the applicant relies, is not unreasonable and arbitrary or in contravention of the Constitution of the United States, but is an exemption to which he is entitled under the facts in this case.

Other constitutional questions raised are not necessary for our determination.

Order of railway commission, denying exemption to applicant, is

REVERSED.