IN RE APPEAL OF FRANCIS R. ORSHEK COMPANY, A CORPORATION.
FRANCIS R. ORSHEK COMPANY, A CORPORATION, APPELLEE AND CROSS-APPELLANT, V. STATE OF NEBRASKA ET AL., APPELLANTS AND CROSS-APPELLEES.

119 N. W. 2d 48

Filed January 11, 1963. No. 35308.

Clarence A. H. Meyer, Attorney General, and Harold S. Salter, for appellants.

Sidner, Lee, Gunderson & Svoboda, for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

The Francis R. Orshek Company, a corporation, filed a claim with the Department of Roads of the State of Nebraska dated November 15, 1960. This claim was disallowed by the Auditor of Public Accounts and the Secretary of State of the State of Nebraska on November 28, 1960. Thereafter the Francis R. Orshek Company prosecuted an appeal to the district court for Lancaster County, as the plaintiff and appellant, and the State of Nebraska, Department of Roads, and public officials involved as defendants and appellees. By agreement of the parties a jury was waived and the cause submitted to the court.

The cause was submitted to the trial court on three specific items: A balance of $3,855.63 admittedly due from the State, but which was being wrongfully withheld because the plaintiff would not execute a release in full; a delay penalty of $2,850 which the State had assessed against the plaintiff; and the sum of $6,843.01 claimed due by the plaintiff, being increased costs arising out of an increase in common carrier rates.

The trial court rendered judgment in favor of the plaintiff and against the State of Nebraska in the sum of $3,855.63 and the sum of $6,843.01 for a total of $10,698.64, together with interest at 6 percent per annum from November 30, 1960, and the remainder of

plaintiff's claim on appeal was denied. Costs were taxed against the State of Nebraska.

The State of Nebraska filed a motion for new trial. The plaintiff also filed a motion for new trial with reference to that part of the judgment which applies to the ruling of the court denying the claim of the plaintiff for $2,850, being the amount of delay penalty withheld by the State, for the reason that the judgment of the court insofar as it applied to the above amount withheld by the State as a penalty for delay was contrary to the law and to the evidence.

The trial court overruled the motion for new trial filed on behalf of the State of Nebraska and also the motion for new trial filed on behalf of the plaintiff. The defendants perfected appeal to this court.

For convenience we will refer to the Francis R. Orshek Company as the plaintiff and to the State of Nebraska, Department of Roads, as the defendant.

The defendant assigned as error that the decision of the trial court is contrary to the evidence and contrary to law.

George Iverson, field superintendent for the plaintiff, testified that he was involved with state project DS-47(10) and was in charge of the work, did the estimating on the job, and supervised the work throughout its construction; that he helped prepare the bids and was present when the bid was submitted; and that he was familiar with all the phases of the work. He further testified that this project consisted of culverts, grading, and paving; that group No. 3 of the contract consisted of paving and miscellaneous work that goes with the paving; that group No. 4 pertained only to culverts; and that the plaintiff bid on groups Nos. 1 and 3, the grading and paving. The contract was based upon certain specifications as to the date of starting and the date of completion. He further testified that the letting was on June 19, 1958, and the completion date was August 15, 1959.

The plaintiff received word from the defendant with reference to a delay in awarding the contract. This was contained in a letter dated July 2, 1958, directed to the plaintiff, and notified the plaintiff that it was the low bidder for grading and paving on project DS-47(10), in the amount of $567,327.80; that delays had occurred in obtaining the right-of-way; and that the purpose of the letter was to request an extension. The letter cited article 3.02 of the 1955 Standard Specifications for Highway Construction, State of Nebraska, hereafter referred to as the specifications, to the effect that the award shall be made within 30 days after the opening of proposals, and requested that this provision be waived. The plaintiff concurred in the waiver. The plaintiff was notified on July 24, 1958, that its bid had been accepted, and the contract was signed on July 29, 1958.

This witness further testified that the first portion of this project would be the culverts, followed by the grading, and then followed by the paving; that the plaintiff started grading on September 18, 1958; that due to the delay in awarding the contract, the work ran into the fall, to a point that the plaintiff was hindered by cold weather which the plaintiff could not contemplate; that the amount of excavation estimated by the State was 359,200 cubic yards, and the actual excavation was 440,078.3 cubic yards; that the total bid on group No. 1 was $66,647; that the final figure for the work done on group No. 1 was $80,648, which the parties agreed was the proper amount after the work was completed; and that the grading overrun had an effect upon the time for completion of the grading operations.

This witness further testified that the Nebraska State Railway Commission increased the tariffs on batch hauls in March 1959; that a batch consists of sand, cement, and gravel which is put into a dump truck at a railroad siding or some other place where these various ingredients are available and the trucker hauls that batch from the railroad siding or loading siding to the place where

the mixer is run and dumps the batch into the mixer; that the rate for batch hauls in effect when the plaintiff bid on the contract and when the contract was let was 37 cents for the first mile and 7 cents for each additional half mile; that the new rate which went into effect in March 1959, was 42 cents for the first mile and $8\frac{1}{2}$ cents for each additional half mile; and that the plaintiff commenced batch hauling on June 23, 1959, after the new rate went into effect.

This witness further testified that he personally made arrangements with the truckers for the transportation of batches, and spent a great deal of time driving around trying to locate truckers; and that he contacted the Nebraska State Railway Commission and was assisted in locating truckers to haul the batches. He obtained a list from the Nebraska State Railway Commission of registered carriers who had certificates of public convenience and necessity over regular and irregular routes. We will hereafter refer to these carriers as RC carriers. He further testified that he personally interviewed and obtained the various truckers.

An exhibit in evidence discloses the amounts paid to the truckers, which was computed on the new Nebraska State Railway Commission rates. The total amount paid these truckers over the old rate was $6,843.01. These truckers were used only on the days the plaintiff was engaged in paving, which was approximately 30 days during the course of the contract. Some of these truckers were RC carriers, others did not have a certificate of public convenience and necessity.

The plaintiff drew up a lease to make it possible for some of these truckers who did not have a certificate of public convenience and necessity issued by the Nebraska State Railway Commission to avoid arrest for not having such a certificate. There was no lease agreement with the RC carriers. The plaintiff furnished funds to make sure the gasoline bills were paid and that other bills relating to the business of such truckers

were paid. The plaintiff, on some occasions, paid the drivers of the trucks that were not holders of certificates of public convenience and necessity. The reason for the lease was a matter of protection to the plaintiff from claims for unemployment insurance, employees' wages, truck drivers' wages, gasoline, and fuel bills. The plaintiff had no control over the truckers. They could and did haul for whomever they desired at any time when they were employed to do so.

On cross-examination of the witness Iverson, article 8.02, subparagraph 11 of the Standard Specifications for 1955, was received in evidence. This subparagraph reads as follows: "The engineer may grant an extension in the working day time allowance or specified completion date when items of extra work not contemplated in the original contract or additional quantities of contract items of work are required. Extensions in time allowances granted for such reasons shall be in proportion to the value of extra and additional work as compared to the total amount of the original contract for the group or groups of work included in the time allowance to be extended. An extension will not be granted for variations in quantities of contract items of work when the net overrun in the value of such variations, computed at contract unit prices, is less than 10 percent of the total amount of the original contract for the group or groups of work included in the time allowances involved."

The witness Iverson testified on cross-examination that the paving operations were started June 23, 1959; and that the grading was ready for the paving operations in the spring of 1959.

The plaintiff received a letter dated April 15, 1959, from Edwin Olmstead, division engineer for the Department of Roads, stating that the soil and climatic conditions were such that the department felt there need be no further delay in the prosecution of the work to be done under the contract, and advising the plaintiff that

the count of working days on the project would be resumed May 1, 1959.

The plaintiff also received a letter dated June 3, 1959, from the Department of Roads which read in part as follows: "Reference is made to the progress of the grading and concrete pavement work included in your contract on Project No. DS-47(10), between Blair and Irvington.

"We would direct your attention to the requirements of the special provisions of this contract with respect to the progress of the work, as follows:

" 'This project is included in the program of projects to be constructed under Section 2(a) of the Federal Aid Highway Act of 1958. It is the intent of the Congress that this program shall provide immediate acceleration of the rate of highway construction.

" 'In furtherance of this intent, the engineer reserves the right to take any measures necessary to insure that all work on this project will be completed on or before the completion date stipulated in the contract.

" 'Paragraph 2 of Article 8.07 in the Standard Specifications is amended to include the following:

" 'If, in the opinion of the engineer, the rate of progress is such that the work will not be completed on or before the specified completion date, the engineer may at the end of the third period or at any time after June 30, 1959, whichever occurs first, after consultation with the contractor and his surety and without giving ten days notice, augment the contractor's forces and equipment as permitted in Paragraphs 2 and 3 of Article 8.09 in the Standard Specifications in order to insure completion of the work by the specified completion date.

" 'Articles 8.02, 8.07 and 8.08 in the Standard Specifications are amended to include the following:

" 'The Department reserves the right to deny any request for an extension in the working day time allowance or of the specified completion date for any reason whatsoever.'

"This contract provides that all work be completed prior to the expiration of a period of 140 consecutive working days, and before August 15, 1959. As of this date, only 9 per cent of the work has been completed, with 44 per cent of the time allowance elapsed. Accordingly, the progress of the work does not conform to the requirements of Article 8.07 of the Specifications, and at the present rate of progress, it appears unlikely that the work can be completed by August 15, 1959, the specified completion date. The only work performed on this project to date consists of rough grading performed by a subcontractor.

"This is to urgently request that you take immediate steps to organize and begin the finish grading and paving work, using sufficient working forces and equipment to complete this work by August 15th."

Another exhibit is a letter from the plaintiff to O. W. Johnson, construction engineer, Department of Roads, dated June 11, 1959, making reference to the fact that the month of May was unseasonably wet, and it was the intention of the plaintiff to be on the project no later than the middle of May; that because of the wet weather and other work, the work on this project was delayed; that the plaintiff was taking steps to start this new work as soon as possible; that the plaintiff was unloading and stockpiling materials at the plant site in Kennard and moving all available equipment from Wymore to Kennard; and that it was the plaintiff's intention to begin the fine grade work some time the next week and would do all in its power to finish the project within the time allowed.

On June 18, 1959, a construction engineer for the Department of Roads wrote a letter to the plaintiff regarding the unsatisfactory progress of the grading and concrete work as provided for by the contract, calling the plaintiff's attention to a letter of June 3, 1959, advising that it appeared unlikely that the work could be completed by August 15, 1959, the specified completion date,

and requesting the plaintiff to take immediate steps to organize and begin to finish the grading and paving work.

The witness Iverson further testified on cross-examination that the plaintiff started to stockpile on June 2, 1959, and began the grading on June 16, 1959; that the plaintiff was charged 17 days overtime from May 1 to June 16, for the reason that the plaintiff did not have the equipment or men on the project work; and that the work was to be done in 140 days, and 150 working days were charged against the plaintiff; and that counting out the 17 days, that would be 133 days that it actually took to complete the work, leaving out the period between May 1 and June 16. This witness further testified with reference to the truckers that the bills of lading consisted of three copies, two of which were carbon copies, prepared by the plaintiff's office manager and furnished by the plaintiff. These bills of lading show the amount received by the truckers, the names of the truckers who did the hauling, and that each trucker received his pay for the work he did and signed a receipt therefor.

On redirect examination this witness testified that at the time the contract was signed, the plaintiff had no way of knowing about the overrun in yardage excavation. If it had, the plaintiff would have requested additional time for completion of the work, and had it not been for the overrun the work would have been completed within the time provided by the contract.

This witness testified on recross-examination that he noticed that under the heading of "Progress of Work" in the special provisions it was stated that this project was included in the program of projects to be constructed under section 2(a) of the Federal Aid Highway Act of 1958, and it was intended by the Congress that this program should provide immediate acceleration of the rate of highway construction; and that he read these special provisions. In other words, he knew it was a speedup program.

This witness further testified that the last paragraph

of this particular subheading "Progress of Work" says: "The Department reserves the right to deny any request for an extension in the working day time allowance or of the specified completion date for any reason whatsoever." This witness was aware of the above provision.

On January 12, 1960, a construction engineer for the Department of Roads wrote a letter to the plaintiff stating: "We are attaching a copy of an extension of contract time allowance and assessment of liquidated damages, which is applicable to the completion of your contract on Project No. DS-47(10).

"The contract time allowance overran 10 working days and 39 working days were charged after the contract completion date.

"Bids were received for this work on June 19, 1958, however, the contract was not awarded until July 24, 1958. Contracts are normally awarded within 10 calendar days of the letting. Accordingly, it is considered that the normal beginning of work was delayed for 25 calendar days by the late award of contract, and to compensate for this delay, we are extending the contract completion date for an additional 25 calendar days to September 9, 1959, without the assessment of liquidated damages.

"The remaining overrun of 19 working days charged after September 9, 1959, is considered to have resulted from your failure to start the paving operations at an earlier date in 1959, and the further unnecessary delay in the shouldering and finishing operations after the concrete pavement work was completed; for which it is necessary to deduct liquidated damages at the rate of $150.00 per working day as stipulated in the special provisions of the contract, the total deduction amounting to $2,850.00."

There is other evidence in the record relating to the number of truckers used on this project by the plaintiff and the number of truckers who held certificates of public convenience and necessity issued by the Nebraska

State Railway Commission. There is also evidence relating to the leases entered into between the plaintiff and certain truckers who did not hold certificates of public convenience and necessity issued by the Nebraska State Railway Commission, to the effect that such leases were a subterfuge and an endeavor to circumvent the regulations of the Nebraska State Railway Commission.

The following are applicable to this appeal.

"The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles. * * * In construing a writing it is the duty of the court to give to words used their ordinary and popularly accepted meaning in the absence of explanation or qualification." Smith v. Game, Forestation & Parks Commission, 170 Neb. 593, 103 N. W. 2d 829.

In Adolf v. Union Nat. Life Ins. Co., 170 Neb. 38, 101 N. W. 2d 504, while this action has to do with a contract of insurance, the court set forth the following: "But where the contract is plain and unambiguous in its meaning the contract will be enforced according to its terms. Unless this be the law, the attaching of liability on an insurance company, contrary to the plain meaning of the contract, would be nothing less than a rewriting of the liability provisions of the contract. It appears to us that it would be a dangerous innovation of contract law to hold that one is not bound by what he signs, and that that which he fails to read or understand should be read out of the contract." There are cases to this effect too numerous to cite.

The defendant contends that the truckers used on this project were not common carriers, and consequently the plaintiff is not entitled to recover for the new rate for batch hauls made effective in March 1959 by the Nebraska State Railway Commission for the type of work the truckers were required to do on this project.

The term "common carrier" means any person who or which undertakes to transport passengers or property

for the general public in intrastate commerce by motor vehicle for hire, whether over regular or irregular routes, upon the highways of this state. See, Rodgers v. Nebraska State Railway Commission, 134 Neb. 832, 279 N. W. 800; § 75-223, R. R. S. 1943; Ferguson Trucking Co., Inc. v. Rogers Truck Line, 164 Neb. 85, 81 N. W. 2d 915.

In Cushing v. White, 101 Wash. 172, 172 P. 229, L. R. A. 1918F 463, the court said: "* * * a common carrier is one whose occupation is the transportation of persons or things from place to place for hire or reward, and who holds himself out to the world as ready and willing to serve the public indifferently in the particular line or department in which he is engaged; the true test being whether the given undertaking is a part of the business engaged in by the carrier which he has held out to the general public as his occupation, rather than the quantity or extent of the business actually transacted, or the number and character of the conveyances used in the employment." The opinion gives an exhaustive review of definitions of the term "common carrier."

We interpret the provisions of the contract relating to the increase in rates for batch truckers to mean that any increase in rates adopted by the Nebraska State Railway Commission for the work being done by truckers on the project such as the one here involved, to be effective in March 1959, involved only such truckers who held certificates of public convenience and necessity issued by the Nebraska State Railway Commission at that time and until such work was completed.

There is no merit to the defendant's contention as to the alleged invalidity of the bills of lading and the receipts given by the truckers to the plaintiff for the pay they received for the work done on this project by them. An examination of the exhibits clearly indicated them to be the type of bill of lading and receipt required,

which the defendant wanted the plaintiff to furnish and which the plaintiff did furnish.

The plaintiff cross-appealed, assigning as error that the district court erred in holding that the defendant could assess a penalty of $2,850 against the plaintiff without showing either its actual damage or that actual damages were impossible of ascertainment, and in holding that under the circumstances the plaintiff should be assessed any damages because of its delay in completion of its contract.

The contract provides: "For each working day that the work contemplated in Groups 1 and 3 shall remain unfinished after the expiration of the time for completing the work, determined as outlined in the Standard Specifications, or after the expiration of such additional time as may be allowed by the engineer, the sum of one hundred fifty dollars ($150.00) per day shall be paid by the contractor."

The contract also provides: "This project is included in the program of projects to be constructed under Section 2(a) of the Federal Aid Highway Act of 1958. It is the intent of the Congress that this program shall provide immediate acceleration of the rate of highway construction.

"In furtherance of this intent, the engineer reserves the right to take any measures necessary to insure that all work on this project will be completed on or before the completion date stipulated in the contract.

"Paragraph 2 of Article 8.07 in the Standard Specifications is amended to include the following:

"If, in the opinion of the engineer, the rate of progress is such that the work will not be completed on or before the specified completion date, the engineer may at the end of the third period or at any time after June 30, 1959, whichever occurs first, after consultation with the contractor and his surety and without giving ten days notice, augment the contractor's forces and equipment as permitted in Paragraphs 2 and 3 of Article 8.09 in

the Standard Specifications in order to insure completion of the work by the specified completion date.

"Articles 8.02, 8.07, and 8.08 in the Standard Specifications are amended to include the following:

"The Department reserves the right to deny any request for an extension in the working day time allowance or of the specified completion date for any reason whatsoever."

By the provisions of the contract, this project being deemed one of expediency to be completed within the time as provided by the contract, it is obvious that by the foregoing provisions thereof and the evidence heretofore set out, the engineer, in granting an extension of working days time allowance for completion of the contract, had a permissive right, or discretionary right only, and the Department of Roads reserved the right to deny any request for an extension in the working days time allowance or the specified completion date for any reason whatsoever. We have detailed the evidence. It discloses that the plaintiff was fully cognizant of and familiar with all of the terms of this contract and the standard specifications relating thereto. We conclude that the trial court did not err in allowing the defendant to assess liquidated damages in the sum of $150 a day for a period of 19 working days by which the plaintiff overran its contract. The plaintiff's cross-appeal cannot be sustained.

With reference to the payments made to the truckers who held certificates of public convenience and necessity issued by the Nebraska State Railway Commission and the hauling done by them for the plaintiff during the course of the contract when the new rate became effective in March 1959, we reverse the judgment and remand the cause to determine the accurate amount due the truckers above mentioned. When this amount is accurately determined there should be added thereto the sum of $3,855.63, and judgment should be rendered by the trial court for the amount thus ascertained, with

interest at the legal rate of 6 percent per annum on such amount from November 30, 1960.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.

SIMMONS, C. J., not participating.