WILLIAM J. MARQUIS, APPELLANT, v. POLK COUNTY TELEPHONE COMPANY, APPELLEE.

FILED JULY 1, 1916. No. 19312.

1. **Municipal Corporations: PUBLIC UTILITIES: REGULATION OF RATES.** Unless expressly authorized and empowered by the legislature so to do, a municipal corporation has no power by contract to deprive the state of the right of regulation of rates of a public service corporation.

2. **Telephones:** RATES: REGULATION. A contract or agreement made in a franchise ordinance by which the maximum rates to be charged by a telephone company for the use of telephones by the inhabitants of the city are determined is made subject to the right of regulation.

3. ———: ———: ———. Since the adoption of the constitutional amendment creating the state railway commission and the passage of the law specifying the duties of said commission, that body has power to regulate the rates charged for the use of telephones in cities of the second class.

4. **State Railway Commission:** DECISIONS: APPEAL. The statute provides that, in appeals from the decision of the railway commission in the matter of rates or charges, such a decision is *prima facie* evidence that the rates fixed are just and reasonable, and such rates shall remain until annulled, modified or revised by the commission, or until finally adjudged to be unreasonable and unjust in a court of competent jurisdiction. Sections 6128, 6139, Rev. St. 1913.

5. **Telephones:** RATES. Evidence examined, and *held*, that the rate of $2.50 a month allowed by the state railway commission to be charged for the use of a telephone for business purposes in the city of Stromsburg has not been shown to be unreasonable and unjust.

APPEAL from the State Railway Commission. *Affirmed.*

*V. E. Wilson,* for appellant.

*King, Bittner & Campbell* and *Mills & Beebe, contra.*

LETTON, J.

This is an appeal from a ruling and order of the state railway commission.

In 1902 the city of Stromsburg passed an ordinance granting a right of way to the Golden Rod Telephone Company and its assigns through the streets of that city for telephone and telegraph purposes, and it was further provided "that the real value or use of any telephone in any public office or place of business in said city shall not at any time exceed the sum of one and 50/100 ($1.50) dollars per month, or in any private dwelling-house the sum of one ($1.00) dollar per month, and that the city

of Stromsburg, Nebraska, shall have the use of three tele-
phones, during the life of this ordinance, free of rental
charge or any charge whatever." It was also provided
that the telephone company "shall at all times permit their
poles to be used for the purpose of placing and maintain-
ing thereon any wires which may be necessary for the
use of the police or fire department for the use of the city."
The defendant is the successor and assignee of the Golden
Rod Telephone Company. The complainant is the user of
a business telephone. He charges that on April 1, 1913,
without the consent of the city of Stromsburg, the respon-
dent arbitrarily increased the charge made by it for the
use of business telephones to the sum of $2.50 a month.

For a second cause of action, it is alleged that the re-
spondent's charge for a residence telephone is $1 a month
in the city and $1 a month for the farm lines; that the
service is poor and defective; that the charges for the use
of a business telephone are unreasonable, unjust, excessive
and discriminatory, and that a just and reasonable charge
for the business telephones is not more than $1.50 a month.
Respondent pleads the adoption of the constitutional
amendment creating the state railway commission; that
the rates of which complaint is made were filed with and
approved by that body; it denies that the lines, equip-
ment or service are faulty; and alleges that the rate of
$1.50 a month for a business telephone is insufficient to
justify carrying on the business; that to have continued to
carry on the business at such rate would have bankrupted
the defendant; and that $2.50 a month is a fair charge.

The railway commission, after a hearing, dismissed the
complaint, but made certain orders as to maintenance and
repairs, the validity of which is not in issue.

Complainant admits that the city of Stromsburg had no
express authority from the state to grant a franchise or
to enter into an agreement fixing telephone rates, but he
contends that the city had implied power to do so by reason
of its ownership and control of the streets, alleys and pub-
lic grounds, and by reason of power to contract conferred

upon it by statute. In the ordinance granting the franchise, the city contracted in its own behalf for the use of the poles of the grantee for carrying wires of the city for fire and police purposes, and also contracted for its free use of certain telephones. These considerations moved directly to the city. The real question is whether the city had power to contract in behalf of telephone users in such a manner that the right of regulation at that time inherent in the legislature was taken away. Unless the legislature by its own act specifically parted with the power to regulate and conferred it upon the municipal corporation in direct terms, such a power could not exist in the city, and whatever contract or agreement was made between it and the telephone company in behalf of telephone users within its limits was, and must necessarily have been, made subject to the legislative right of regulation. Indeed, to hold that an implied power to contract exists from the right to control the streets, and that contracts so made might not be impaired, might prove exceedingly detrimental to the public welfare. The progress of invention in the cheapening of processes has been so startling in recent years that a rate which is fair to both parties now may, in the case of gas, electric light, power, transportation, or like companies, yield in a few years an excessive profit on the capital invested. In such a case, the public might be powerless to impair the obligation of the contract.

The courts, therefore, will not hold that the exclusive power to contract exists unless plainly and expressly granted. *State v. Wyandotte County Gas Co.,* 88 Kan. 165, affirmed on error to the supreme court of the United States under the title, *Wyandotte County Gas Co. v. State of Kansas,* 231 U. S. 622; *Home Telephone & Telegraph Co. v. City of Los Angeles,* 211 U. S. 265; *Benwood v. Public Service Commission,* 75 W. Va. 127, L. R. A. 1915C, 261, and note, p. 264; *Milwaukee Electric Ry. & Light Co. v. Railroad Commission,* 153 Wis. 592; *City of Kenosha v. Kenosha Home Telephone Co.,* 149 Wis. 338.

This court has held in a number of cases that contracts made by public service corporations are made with the right of regulation as a part of the contract, and that the power to lower excessive rates or to increase inadequate rates still rested solely in the legislature until by virtue of the constitutional amendment the same power was extended to the state railway commission. *McCook Irrigation & Water Power Co. v. Burtless,* 98 Neb. 141, and cases cited. The fact that at the time the franchise ordinance in question was passed the railway commission was not in existence is not material. That body was given power to regulate the rates of common carriers, and by section 6124, Rev. St. 1913, the term "common carrier" is expressly made to include telephone companies.

There is a distinction between the cases cited by the complainant and the conditions here. In some of these cases there were constitutional or statutory provisions which were controlling, in others the contract provisions of the franchises under consideration did not relate to the fixing of rates. But, even if these authorities were to the contrary, we believe that the reasoning of the cases cited is more persuasive.

It is next contended that the commission erred in requiring the complainant to assume the burden of proof; in fixing too great an amount as the present value of the property of respondent; in fixing too great an amount which the telephone company is permitted to earn in the future for the purpose of maintenance and depreciation and for dividends, and in finding that the new rate does not discriminate unjustly against the users of business telephones.

Section 6128, Rev. St. 1913, provides that, in any appeal prosecuted from a decision in which the charges of a common carrier are involved, such decision shall be received in any appeal "as *prima facie* evidence that the rates therein fixed are just and reasonable." By section 6139, Rev. St. 1913, it is provided that the order of the commission "shall be in force and effect from and after

the date fixed by the commission and shall so remain until annulled, modified or revised by the commission, or until finally adjudged to be *unreasonable and unjust* in a court of competent jurisdiction." We must consider these complaints bearing in mind these legislative directions.

So far as the record shows, the complainant voluntarily assumed the burden of producing evidence to support the allegations of his complaint. His brief states that "he was required to open the hearing," but he has pointed out no such order or a request for a different order of proceedings, and we have found none in the record.

With respect to the value placed upon the property by the commission, a physical examination of the property was made by an expert in the service of the commission, and its books and accounts were likewise examined by the expert accountant of the commission. The value fixed by the commission is placed at the sum of $79,925. To obtain this result, the commission took into consideration the amount of money put into the plant by the Golden Rod Company, the purchase price paid for it by the respondent, the fact that services were performed for some time in the organization and engineering for which no compensation in excess of $1,000 had been paid, the amount of money borrowed, stock issued in lieu of cash dividends, the money having been actually used in the construction of the physical property, as well as other items. By this valuation, the average cost of each subscriber's station is something less than $60. After considering all the evidence and the principles of law which have been laid down by the courts in the valuation of public service corporations, we are satisfied that this is not an unreasonable value. While no fixed standard of valuation has yet been evolved by the courts and each case must be determined upon its own facts, there are certain general principles which have been deduced. One of the latest expressions is that made by Mr. Justice Hughes, writing the opinion of the United States supreme court in *Simpson v. Shepard,* 230 U. S.

100 Neb.—10

352, 434.   He says: "The basis of calculation is the 'fair
value of the property' used for the convenience of the
public. *Smyth v. Ames,* 169 U. S. 466, 546.   Or as it was
put in *San Diego Land & Town Co. v. National City,* 174
U. S. 739.   'What the company is entitled to demand, in
order that it may have just compensation, is a fair return
upon the reasonable value of the property at the time it is
being used for the public.' "  See, also, *San Diego Land
& Town Co. v. Jasper,* 189 U. S. 439; *Willcox v. Consoli-
dated Gas Co.* 212 U. S. 19, 15 Am. & Eng. Ann. Cas. 1034.

The ascertainment of that value is not controlled by
artificial rules.   It is not a matter of formulas, but there
must be a reasonable judgment, having its basis in a proper
consideration of all relevant facts.   The scope of the in-
quiry was thus broadly described in *Smyth v. Ames,* 169
U. S. 466, 546: "In order to ascertain that value, the origi-
nal cost of construction, the amount expended in permanent
improvements, the amount and market value of its bonds
and stock, the present as compared with the original cost
of construction, the probable earning capacity of the prop-
erty under particular rates prescribed by statute, and the
sum required to meet operating expenses, are all matters
for consideration, and are to be given such weight as may
be just and right in each case.   We do not say that there
may not be other matters to be regarded in estimating
the value of the property.   What the company is entitled
to ask is a fair return upon the value of that which it em-
ploys for the public convenience.   On the other hand, what
the public is entitled to demand is that no more be ex-
acted from it for the use of a public highway than the
services rendered by it are reasonably worth."

It is impossible within the limits of this opinion to set
forth at length the history of the construction and opera-
tion of the respondent's system or the details of its prop-
erty.   It was shown that owing to the facts that the
system of bookkeeping formerly used was defective in
detail, that no charge was made for much of the organi-
zation and engineering work, and for other reasons it was

difficult to arrive at the actual cost of the property. It has not been claimed that any false or padded accounts have been kept. Taking the valuation of the engineer, the expenditures admitted by the complainant and all of the facts in evidence, we think that, though there is room for a difference of opinion as to the present value, the amount named by the commission is not unreasonable.

Did the commission allow too high a rate for depreciation and maintenance? The opinion of the commission recites: "The physical condition of the property is below standard requirements and considerable reconstruction is necessary. This condition, however, is not due entirely to the lack of revenue, as consideration must be given to the amount of money distributed to the stockholders in the way of dividends. It is apparent that a greater amount has been taken from the earnings for this purpose than was warranted by the requirements for a reasonable return." Continuing, it is said that when the company began its operations a strong competitor was already in the field. Keen competition resulted here as elsewhere in Nebraska, and the investment was in reality hazardous. That since dividends were paid in excess of the actual earnings, if a proper allowance had been made for maintenance, this necessitates the reduction of dividends until the plant is placed in a normal condition, and 10 per cent. of the cost of the property is ordered to be set aside annually for that purpose. It is also stated that the income is now less than formerly, and that even if the property had been kept up, the revenue derived under the former rate would not be sufficient to furnish a fair return. The excess amount retained to restore the plant is to be obtained, not by overcharging the telephone user, but by reducing dividends until the cost of this work has been paid. The evidence seems to bear out these conclusions. The expert for the commission testifies from the result of his investigations that the depreciation for the 110 months during which the plant has been in operation amounted annually to about 6 per cent., but that if the patrons of the company

desire service fully up with modern requirements it should be estimated in the future at about 9 per cent., and that in any event the depreciation is·apt to be greater in the future on account of the age of the property; that the present plant is obsolete and good telephone service cannot be had until the present system is changed to a common battery system. There are only 127 business telephones to which the increased rate applies, and the annual revenue derived from the entire number of business telephones is $1,524. Deducting this amount from the present revenue and allowing 10 per cent. for maintenance and depreciation, not more that 4 per cent. would now be available for dividends. This places the increased outlay to restore the plant on the stockholder, where it properly belongs.

As to the claim of unjust discrimination between rates charged for business telephones, and for residence and farm lines, it is difficult to establish a criterion as to a proper difference in rates. It is apparent that the number of calls which an operator at the switchboard will have to answer for a business telephone will ordinarily largely exceed the number of calls for a residence telephone and the cost of operation thus be increased. It would be exceedingly difficult, however, to ascertain the actual facts in this connection. The custom of telephone companies generally is to charge a greater amount for such telephones, and this custom seems to have been universally acquiesced in and not found unreasonable. The complainant has furnished no evidence tending to show that the difference in the rate charged by the respondent is unreasonable, unjust or excessive as compared with that charged for other telephones.

To conclude, it has not been shown that the rate established by the commission, which is *prima facie* valid and reasonable, is unreasonable and unjust. If experience demonstrates that the rate is excessive, the books of the corporation, now required by the commission to be kept in a more accurate and fact-disclosing method, will readily

furnish evidence of unusual profits or exorbitant charges, and in such case any person injuriously affected, including complainant if he is in that class, may apply for a reduction of rates.

The finding and order of the state railway commission are not found to be unreasonable and unjust, and are therefore,

AFFIRMED.

MORRISSEY, C. J., not sitting.