STATE OF NEBRASKA EX REL. ROBERT M. SPIRE, ATTORNEY
GENERAL OF THE STATE OF NEBRASKA, APPELLANT, V.
NORTHWESTERN BELL TELEPHONE COMPANY ET AL., APPELLEES.

445 N.W.2d 284

Filed September 1, 1989.    No. 87-425.

Robert M. Spire, Attorney General, John R. Thompson, Dale A. Comer, and L. Jay Bartel for appellant.

J. Taylor Greer, Bert L. Overcash, and Paul M. Schudel, of Woods, Aitken, Smith, Greer, Overcash and Spangler; Harold L. Rock, David A. Jacobson, Maureen E. McGrath, and Nancy L. Dickhute, of Kutak Rock & Campbell; Richard A. Peterson, of Peterson Nelson Johanns Morris & Holdeman; and Mark E. Belmont for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ., and ENDACOTT, D.J.

SHANAHAN, J.

The Attorney General of the State of Nebraska, as relator, brought a declaratory judgment action in the district court for Lancaster County to have 1986 Neb. Laws, L.B. 835 (the act), now codified as Neb. Rev. Stat. §§ 86-801 et seq. (Reissue 1987), declared unconstitutional on a number of grounds. The

respondents, Northwestern Bell Telephone Company (NWB), Lincoln Telephone and Telegraph Company (LT&T), and AT&T Communications of the Midwest, Inc. (AT&T), which have litigable interests in the validity of the challenged act, contended that L.B. 835 was constitutional in all the provisions challenged by the Attorney General. The district court declared that L.B. 835 is "valid, constitutional, validly enacted and of lawful force and effect."

The Attorney General appeals, assigning as error the district court's (1) failure to hold that L.B. 835 unconstitutionally divests the Nebraska Public Service Commission (PSC) of its regulatory authority, granted in Neb. Const. art. IV, § 20, over telecommunications companies; (2) erroneous conclusion that L.B. 835 constituted valid "specific legislation" under Neb. Const. art. IV, § 20; (3) erroneous conclusion that telephone subscribers are not entitled to procedural due process in connection with telephone rate review proceedings conducted pursuant to L.B. 835; (4) erroneous conclusion that L.B. 835 contains adequate due process safeguards for telephone subscribers, assuming that subscribers are entitled to such protection; and (5) erroneous conclusion that the legislatively expressed goals of L.B. 835 may be fulfilled as a valid exercise of the state's police power.

## STANDARD OF REVIEW

A declaratory judgment action, pursuant to Neb. Rev. Stat. §§ 25-21,149 et seq. (Reissue 1985), is an appropriate method to obtain a judicial construction of a statute or determination of a statute's validity, including resolution of a challenge to the constitutionality of a statute. *Mullendore v. School Dist. No. 1*, 223 Neb. 28, 388 N.W.2d 93 (1986).

In a declaratory judgment action involving the determination of factual issues, such issues may be tried and determined as in other civil actions. § 25-21,157; *Millard Rur. Fire Prot. Dist. No. 1 v. City of Omaha*, 226 Neb. 50, 409 N.W.2d 574 (1987). In appellate review of an action for a declaratory judgment in a law action, factual findings by the trier of fact will not be set aside unless such findings are clearly erroneous. *Heimbouch v. Victorio Ins. Serv., Inc.*, 220 Neb.

279, 369 N.W.2d 620 (1985). In appellate review of an action for declaratory judgment in an equity action, the standard of review for an equity case applies. *OB-GYN v. Blue Cross*, 219 Neb. 199, 361 N.W.2d 550 (1985). In an appeal from a declaratory judgment, the appellate court, regarding questions of law, has an obligation to reach its conclusion independent from the conclusion reached by the trial court. *County of York v. Johnson*, 230 Neb. 403, 432 N.W.2d 215 (1988).

A declaratory judgment that L.B. 835 is unconstitutional might be a basis for injunctive relief against enforcement of the act and, unrelated to a claim for damages, is more akin to relief through an equity action rather than relief through a law action. Cf. *State ex rel. Spire v. Public Emp. Ret. Bd.*, 226 Neb. 176, 410 N.W.2d 463 (1987) (action for a declaratory judgment that a statute was unconstitutional and for an injunction against enforcement of the unconstitutional statute). Consequently, in the present appeal we apply the standard for review of an equity appeal:

> "In an appeal of an equity action, the Supreme Court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the Supreme Court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another."

*Frenzen v. Taylor*, 232 Neb. 41, 42, 439 N.W.2d 473, 474-75 (1989).

One claiming that a statute is unconstitutional has the burden to show that the questioned statute is unconstitutional. *Ewing v. Scotts Bluff Cty. Bd. of Equal.*, 227 Neb. 798, 420 N.W.2d 685 (1988); *Weiner v. State ex rel. Real Estate Comm.*, 217 Neb. 372, 348 N.W.2d 879 (1984).

## ACRONYMS AND TELEJARGON

As the result of *United States v. American Tel. and Tel. Co.*, 552 F. Supp. 131 (D.D.C. 1982), *aff'd* 460 U.S. 1001, 103 S. Ct. 1240, 75 L. Ed. 2d 472 (1983), divestiture of AT&T caused dramatic changes in the telecommunications industry. The

nation was divided into telephone service geographic areas called LATAs, an acronym for "Local Access and Transport Areas." The Bell operating companies, such as NWB, became subsidiaries of a regional holding company. Each holding company, through its subsidiaries, was allowed to provide only local exchange service by nontoll local calls or "POTS" ("Plain Old Telephone Service"), intraLATA toll service (long-distance toll calls to areas within a customer's LATA), exchange access service (customer access to long-distance carriers allowed for LATA to LATA, or "interLATA," service), and directory services. AT&T was free to enter and compete in all markets and, in fact, was granted authority by the PSC to serve Nebraska as an intrastate interLATA long-distance carrier.

Nebraska was divided into three LATAs—one LATA centered around Omaha, another around Lincoln, and the third LATA encompassed the balance of Nebraska.

## BACKGROUND FOR L.B. 835

The Federal Communications Commission controls interstate interexchange long-distance service. Consequently, before L.B. 835, the PSC controlled three basic types of telecommunications in Nebraska: (1) local exchange service, or "POTS"; (2) intraLATA interexchange service (toll calls within the LATA from exchange to exchange); and (3) intrastate interLATA service (toll calls within the state from LATA to LATA). Before L.B. 835, the PSC had authority to approve telephone rates submitted by applications from telecommunications companies, to control entry into and exit from the market by a telecommunications supplier, and to control the quality of service provided by telecommunications companies.

In 1985, the Legislature commissioned the Arthur Andersen Accounting firm to prepare a survey of the telecommunications industry in Nebraska. Andersen's "major observations" were reflected in the "Executive Summary" of its report:

> [1.] Further competition within the telecommunications industry in Nebraska is inevitable. . . .

> [2.] The main influence behind increased competition is technology. . . .

[3.] Based on historical activity, it appears that further changes in the industry and the technologies which support the industry will be at least as rapid and dramatic as changes in the last decade. . . .

[4.] Under the present regulatory framework and pricing structure, bypass of the traditional telephone system is likely to continue and may accelerate as technology advances and competition increases. . . .

[5.] As the industry changes and competition increases, the shifting of revenues may create difficulties for some service providers and opportunities for others. . . .

[6.] The pricing of telephone services has undergone changes and will continue to change.

Andersen's report expressed concern over a recently developing telecommunications phenomenon known as "bypass," when a current customer forgoes service by a local or long-distance telephone company and obtains service through facilities of another company. A microwave system is an illustration of technology which may be involved in a bypass. If a customer, motivated by economic incentive based on the customer's substantial requirements for telephone service, elects to bypass the customer's telephone company, the bypassed company's other customers will pay higher rates "to help support the [bypassed] system's fixed costs" because there are fewer customers.

### THE ACT: L.B. 835

In response to the concerns expressed in Andersen's report and by the telecommunications industry, the Legislature, after much debate, enacted L.B. 835.

### Statutory Objectives of L.B. 835

Section 1 of L.B. 835 (§ 86-801)

declares that it is the policy of the state to:

(1) Preserve affordable telecommunications services;

(2) Maintain and advance the efficiency and availability of telecommunications services;

(3) Ensure that consumers pay only reasonable charges for telecommunications services; and

(4) Promote diversity in the supply of telecommuni-

cations services and products throughout the state.

### PSC's Regulatory Power

Section 3, subsection (1), of L.B. 835 (§ 86-803(1)) concerns the scope of PSC regulation over telecommunications companies:

> Except as provided in sections 1 to 11 of this act, telecommunications companies shall be subject to regulation by the commission [PSC]. Telecommunications companies shall not, however, be subject to any rate regulation by the commission and shall not be subject to provisions as to rates and charges prescribed in Chapter 75, articles 1 and 6. Telecommunications companies shall, instead, file rate lists for their telecommunications services which shall be effective after ten days' notice to the commission with the exception of monthly rates for basic local exchange services.

Thus, for intraLATA interexchange and interLATA service, rates submitted to the PSC become effective after 10 days, and, as the result of L.B. 835, the PSC has no power to review those rates.

### PSC Rate Authority over "POTS"

Section 3, subsection (2), of L.B. 835 (§ 86-803(2)) allows telecommunications companies to change local exchange rates only after 60 days' notice to subscribers affected by the rate change. The requisite notice to customers must include:

> (a) the reasons for the rate increase, (b) a description of the affected service, (c) an explanation of the right of the subscriber to petition the commission for a public hearing on the rate increase, (d) a list of exchanges which are affected by the proposed rate increase, and (e) the dates, times, and places for the public informational meetings required by this section.

L.B. 835 substantially changed the previous PSC regulatory scheme by restricting the situations in which the PSC was empowered to review reasonableness of certain rates charged by telephone companies. Under L.B. 835, the PSC has power to review rates for basic local exchange service only (1) when a complaint, signed by a specified percentage of subscribers

(from 2 percent to 5 percent, depending on the number of subscribers affected by the rate in question), is filed within 60 days after notice has been sent to the subscribers, and (2) on PSC's own motion if a telecommunications company has increased basic local exchange rates by more than 10 percent in any 12-month period. L.B. 835, § 3(3) and (7) (§ 86-803(3) and (7)). Under both rate review procedures, the PSC must hold a hearing within 90 days after (1) the subscribers' complaint has been filed (customer-instigated review) or (2) notice to the telecommunications company (PSC-initiated review), and determine whether the proposed rates are "fair, just, and reasonable." Within 60 days after the hearing, the PSC may enter "an order adjusting the rates and charges at issue, except that the [PSC] may not set any rate or charge below the actual cost of providing such service . . . ." L.B. 835, § 3(7). If the PSC fails to issue an order within 60 days after the hearing, the rates placed in effect by the telecommunications company are deemed approved. L.B. 835's provision for customer-initiated rate review by the PSC terminates August 31, 1991.

### Company-Initiated Review

A telecommunications company may file an application with the PSC and request the PSC to prescribe fair and reasonable rates for the company. L.B. 835, § 3(4) (§ 83-803(4)).

### Quality of Service

Subsection (6) of § 3 in L.B. 835 provides that the PSC "shall retain quality of service regulation over the services provided by all telecommunications companies . . . ." § 86-803(6).

### Change in Rates Set by PSC

In L.B. 835, subsection (10) of § 3 provides: "No telecommunications company may change its basic local exchange rate within ninety days after entry of a final order adjusting such rate pursuant to subsections (3), (4), and (7) of this section." § 86-803(10).

### Monitoring by PSC; Annual Report to Legislature

Section 4 (§ 86-804) of the act pertains to the PSC's continued monitoring of the telecommunications industry:

The commission shall provide the Legislature with an

annual report on or before January 5 of each year on the status of the Nebraska telecommunications industry. The report shall describe: (1) The quality of telecommunications services being provided to the citizens of Nebraska; (2) the availability of diverse and affordable telecommunications services to all of the people of Nebraska; and (3) the level of rates of local exchange companies and interexchange telecommunications companies. The report shall also address the question of the need for further legislation to achieve the purposes of sections 1 to 11 of this act.

*PSC Control over Entry into the Market; Record Keeping*
Section 5 of L.B. 835 (§ 86-805) authorizes the PSC to issue a certificate to a telecommunications company for interLATA interexchange service within Nebraska and to deny certification to any telecommunications company which:

(a) Does not provide the information required by the commission;

(b) Fails to provide a performance bond, if required;

(c) Does not possess adequate financial resources to provide the proposed service; or

(d) Does not possess adequate technical competency to provide the proposed service.

Section 7 of the act (§ 86-807) provides:

(1) Except for requirements established by statute, the commission may limit, remove, or waive regulatory requirements for telecommunications companies when it determines that competition will serve the same purposes as public interest regulation. The commission may revoke any waivers it grants or reinstate regulations if such revocation or reinstatement would protect the public interest upon a finding that the telecommunications company is restricting market output, impairing customer interest, or engaging in unlawful anticompetitive activity.

(2) A telecommunications company shall at a minimum:

(a) Keep its accounts according to rules and regulations adopted and promulgated by the commission;

(b) File financial reports with the commission as required by and in a form and at times prescribed by the commission;

(c) Keep on file at the commission such current price lists and service standards as the commission may require; and

(d) Cooperate with commission investigations of customer complaints.

### Nonregulated Activities

Section 8 of the act (§ 86-808) exempts "[o]ne-way broadcast or cable television transmission of television or radio signals," mobile radio service, radio paging service, and cellular services from regulation by the PSC.

### Actions Against Telecommunications Companies

Section 11 of L.B. 835 (§ 86-811) allows "any interested person" to file an action in the district court concerning a telecommunications company's alleged violation of L.B. 835. If the company has violated the act, "the court may issue an injunction or other proper process to restrain the telecommunications company . . . from continuing such violation and may order additional relief."

### Severability

Section 16 of the act provides: "If any section in this act or any part of any section shall be declared invalid or unconstitutional, such declaration shall not affect the validity or constitutionality of the remaining portions thereof."

## L.B. 835'S ECONOMIC IMPACT ACCORDING TO EXPERTS

Conflicting testimony from two experts in telecommunications economics was the focal point of the declaratory judgment action. Dr. Walter Bolter, a certified public accountant and engineer, who also holds a Ph.D. in economics, expressing his opinion whether L.B. 835 advanced the four goals listed in the statute's "policy statement," testified that the act would neither preserve affordable telecommunications service in Nebraska nor advance efficiency and availability of telecommunications service. Dr. Bolter based his opinion on the

"very monopolistic" state of the telecommunications industry in Nebraska, which, coupled with PSC's diminished power to regulate rates and L.B. 835's barriers for entry into the marketplace, accorded telecommunications companies an unrestricted ability to raise rates. In essence, Dr. Bolter questioned the wisdom of leaving price control to market forces when, in his view, such forces were too insignificant to exert any influence on the major telecommunications companies.

Dr. Bolter further testified that under L.B. 835, consumers would "only by happenstance" pay reasonable rates for their telecommunications services. Once again, Dr. Bolter based his opinion on the absence of market forces as a substitute for regulation and control of prices for telecommunications. Finally, Dr. Bolter testified that he did not believe that L.B. 835 would "promote diversity in the supply of telecommunications services and products" in view of a new supplier's difficulty which would be experienced in entering and competing within the telecommunications industry. Dr. Bolter also testified about the condition of competition in three areas of the telephone market: interLATA; intraLATA interexchange; and intraLATA local exchange, or "POTS." Despite the presence of other interLATA suppliers, AT&T's dominance prevented competition in the interLATA market. The intraLATA interexchange market is much more concentrated than the interLATA market and is, therefore, more vulnerable to "price leadership" by a large, monopolistic supplier. Dr. Bolter noted, however, that the PSC had received applications from new entrants into the intraLATA market—applicants which could provide some competition to existing suppliers. Although there have been no applications for local telephone service by new entrants which could compete with existing suppliers, some technological developments, such as private microwave systems and cellular phones, may provide customers with local exchange service. According to Dr. Bolter, statistics regarding revenues lost by major telecommunications companies as the result of bypass are "very sketchy."

John Vondras, executive assistant to the president of NWB and a NWB employee for 16 years, testified regarding "bypass," the most significant form of competition

confronting NWB. Bypass occurs when a customer of NWB, AT&T, or LT&T uses another company's facilities to complete a telephone call. In a study of NWB's 149 largest customers, NWB determined that 140 customers had a volume and pattern of telecommunications usage which made bypass economically attractive. According to Vondras, NWB's study revealed that bypass could result in lost revenue of $27 million for NWB. Vondras testified that on account of a number of technological advances during the past few years, NWB faces competition in the local exchange market.

Dr. Frank Alessio, who has a Ph.D. in economics and is a lecturer in the public utilities program at Stanford University, performed his own analysis of the telecommunications industry's condition in Nebraska. Dr. Alessio focused on "revenue vulnerability," a telephone company's traditional revenue which a new competitor might be able to "pick off." Dr. Alessio testified that because high-volume customers in both Omaha and Lincoln were clustered in relatively small geographic areas, a new entrant into the market could easily obtain a substantial volume of business without incurring inordinately high costs for entering the market. Based on his analysis, Dr. Alessio concluded that the telecommunications market in Nebraska was "technically contestable, rivalrous and workably competitive."

Referring to L.B. 835, Dr. Alessio testified that as a result of changes in technology and customer needs, "traditional public utility regulation is no longer workable in the current environment in telecommunications." Dr. Alessio characterized L.B. 835 as "a refreshingly realistic view of what regulator oversight needs to be in the dynamic market time we are seeing." Regarding L.B. 835's policy statement, Dr. Alessio disagreed with Dr. Bolter's opinion that customers would pay reasonable telephone rates only by happenstance. According to Dr. Alessio, to preserve affordable telephone rates for consumers, existing telecommunications companies needed competitive freedom which was unobtainable under previous telephone regulation by the State of Nebraska. Dr. Alessio also expressed his belief that L.B. 835 will foster diversity in telecommunications service, may encourage new competitors

to enter the market, and will advance availability and efficiency in telecommunications services throughout Nebraska.

## CONSTITUTIONAL AUTHORITY OF THE PSC

The Attorney General's first two assignments of error relate to the application of Neb. Const. art. IV, § 20, which outlines the constitutional authority of the PSC:

> The powers and duties of such commission [the PSC] shall include the regulation of rates, service and general control of common carriers as the Legislature may provide by law. But, in the absence of specific legislation, the commission shall exercise the powers and perform the duties enumerated in this provision.

The Attorney General claims that L.B. 835 unconstitutionally divests the PSC of its authority to regulate rates because the act does not constitute "specific legislation" by which the Legislature may restrict the authority exercisable by the PSC.

PSC authority over telephone companies is rooted in legislative, judicial, and electoral activities during the early 1900s. In the election of November 6, 1906, the forerunner of Neb. Const. art. IV, § 20, was added by amendment to the state Constitution, an amendment which created the "State Railway Commission" with authority to regulate "common carriers." Comp. Stat. § 421a (1909). In 1907, the Legislature enacted statutes "creating and defining the Powers, Duties and Qualifications of the State Railway Commission" and which included telephone companies within the definition of "common carriers." Rev. Stat. § 6124 (1913). See, also, *Marquis v. Polk County Telephone Co.*, 100 Neb. 140, 144, 158 N.W. 927, 928 (1916): "[B]y section 6124, Rev. St. 1913, the term 'common carrier' is expressly made to include telephone companies." PSC control over rates and service of telephone companies has been repeatedly recognized by this court. See, *Hooper Telephone Co. v. Nebraska Telephone Co.*, 96 Neb. 245, 147 N.W. 674 (1914); *Marquis v. Polk County Telephone Co., supra*; *Farmers & Merchants Telephone Co. v. Orleans Community Club*, 116 Neb. 633, 218 N.W. 583 (1928); *Block v. Lincoln Tel. & Tel. Co.*, 170 Neb. 531, 534, 103 N.W.2d 312, 314-15 (1960) ("Within the meaning of the Constitution

telephone companies are common carriers").

Before the constitutional amendment establishing the PSC, the Legislature was the sole repository for control over telephone company rates. The constitutional amendments of 1906 and 1907 extended to the PSC the regulatory power which was previously exercisable only by the Legislature. *Marquis v. Polk County Telephone Co., supra.*

> Briefly stated, the railway commission [PSC] is created by section 20, article IV, of the Constitution. It is granted powers and duties which include the regulation of rates, service, and general control of common carriers as directed by the Legislature. In a field where the Legislature has not acted, the commission is authorized to exercise the powers and perform the duties enumerated in the constitutional provision. This means, of course, that the Legislature may properly enact specific legislation limiting the scope of the commission's powers.

*Union Transfer Co. v. Bee Line Motor Freight*, 150 Neb. 280, 283, 34 N.W.2d 363, 365 (1948). See, also, *State, ex rel. Missouri P. R. Co., v. Clarke*, 98 Neb. 566, 153 N.W. 623 (1915); *In re Lincoln Traction Co.*, 103 Neb. 229, 171 N.W. 192 (1919); *Blackledge v. Farmers Independent Telephone Co.*, 105 Neb. 713, 181 N.W. 709 (1921); *State v. Chicago & N. W. Ry. Co.*, 147 Neb. 970, 25 N.W.2d 824 (1947); *Dahlsten v. Harris*, 191 Neb. 714, 217 N.W.2d 813 (1974). As a result of specific legislative action,

> the Legislature has the right by law to prescribe how the commission shall proceed and what authority it may exercise in the regulation and general control of common carriers. Therefore, when specific legislation is enacted upon a subject in relation thereto, such legislation preempts the field so occupied and thereby prescribes and controls the powers and duties of the commission.

*Chicago & N. W. Ry. Co. v. County Board of Dodge County*, 148 Neb. 648, 653, 28 N.W.2d 396, 400 (1947). See, also, *State ex rel. State Railway Commission v. Ramsey*, 151 Neb. 333, 337, 37 N.W.2d 502, 506 (1949) ("The commission [PSC] is a regulatory body of constitutional origin not amenable to legislative interruption or limitation of its status or powers

except by specific legislation . . ."). Although the PSC is an independent regulatory body under the Nebraska Constitution, PSC jurisdiction to regulate common carriers may be restricted by the Legislature through "specific legislation." Neb. Const. art. IV, § 20.

L.B. 835 undoubtedly restricts the PSC's power. For that reason, under Neb. Const. art. IV, § 20, validity of L.B. 835 turns on the question whether the act constitutes "general" or "specific" legislation. As noted in *State ex rel. State Railway Commission v. Ramsey, supra*:

> The right to regulate "as" the Legislature may provide means the right to regulate in the manner in which the Legislature provides. . . . The word "specific" in the phrase "in the absence of specific legislation" is synonymous with the word "particular." The term implies a definite restriction on the kind and extent of legislation over common carriers which is permissible by the Legislature. It [specific] is defined in 58 C. J., Specific, p. 826 as follows: "Definite, or making definite; limited or precise; precisely formulated or restricted; tending to specify or make particular. Although the term is a relative one, it is limited to a particular, definite, or precise thing, and hence is the very opposite of 'general'." It was not intended by the use of these words to authorize unlimited, broad, general legislation in reference to the control and regulation of common carriers.

*Id*. at 344, 37 N.W.2d at 509.

Our prior decisions regarding interpretation of Neb. Const. art. IV, § 20, seem to draw a distinction between statutes by which the Legislature attempted to transfer regulation of common carriers to an agency distinct from the PSC and statutes by which the Legislature itself "occupies the field" and becomes, in effect, the regulatory body which exercises control over common carriers. The Legislature cannot constitutionally divest the PSC of jurisdiction over a class of common carriers by vesting a governmental agency, body of government, or branch of government, except the Legislature, with control over the class of common carriers. *State ex rel. State Railway Commission v. Ramsey, supra* (unconstitutional legislative

attempt to vest the Nebraska Department of Aeronautics with power to "control common carriers by air"); *Rivett Lumber & Coal Co. v. Chicago & N. W. R. Co.*, 102 Neb. 492, 167 N.W. 570 (1918) (statute designed to produce reasonable rail service did not authorize the court to exercise control over service by a railroad as a common carrier). However, a legislative act or statute may constitutionally divest the PSC of jurisdiction over common carriers to the extent that the Legislature, through specific legislation, has preempted the PSC in control of common carriers. See, *Rodgers v. Nebraska State Railway Commission*, 134 Neb. 832, 844, 279 N.W. 800, 807 (1938) ("[T]he plenary power of the railway commission may only be curtailed or diminished where the legislature has, by specific legislation, occupied the field"); *State v. Chicago & N. W. Ry. Co., supra* at 977, 25 N.W.2d at 828 ("The legislative act under consideration clearly deprives the Nebraska State Railway Commission of any power to act to the extent that it occupies the field").

Thus, while the Legislature may constitutionally occupy a regulatory field, thereby specifically and preemptively excluding the PSC from some control over a class of common carriers, the Legislature cannot absolutely and totally abandon or abolish constitutionally conferred regulatory control over common carriers. For example, legislation which directs that the PSC cannot exercise its constitutionally granted power over a particular common carrier or a class of common carriers, or which dictates that the Legislature shall not enact regulatory statutes concerning a common carrier or class of common carriers, violates Neb. Const. art. IV, § 20. If such abandonment or abolition of regulatory control were permitted, the protection afforded to Nebraska citizens by the constitutionally created and empowered PSC would cease to exist. Neb. Const. art. IV, § 20, requires that the power to regulate common carriers exist either in the PSC or the Legislature.

L.B. 835 does not totally divest the PSC of jurisdiction over telecommunications companies, completely preclude the PSC's regulation of telecommunications companies, or transfer regulatory control to a governmental agency, body of

government, or branch of government except the Legislature. Instead, L.B. 835 restricts the situations and manner in which the PSC may exercise its regulatory power over rates of telecommunications companies. Regarding basic local exchange service, L.B. 835 expressly and precisely delineates the situations and manner in which the PSC may exercise its power in relation to its duties. See L.B. 835, § 3(3) and (7) (§ 86-803(3) and (7)). Concerning intrastate toll calls, however, L.B. 835 completely divests the PSC of its regulatory control over rates. L.B. 835, § 3(1) (§ 86-803(1)). The constitutionality of these restrictions on the PSC's regulatory power depends on the characterization of the statute as either specific legislation or general legislation.

Although L.B. 835 restricts the PSC's authority over the rates set by telecommunications companies, the act leaves intact PSC control over the quality of service provided by telecommunications suppliers, and retains the PSC's power to allow entry into and exit from the marketplace. L.B. 835, § 3(6) (§ 86-803(6)); L.B. 835, §§ 5 and 6 (§§ 86-805 and 86-806). Thus, the PSC will "investigate and resolve subscriber complaints concerning quality of telecommunications service, subscriber deposits, and disconnection of service." L.B. 835, § 3(6) (§ 86-803(6)). If informal resolution of the complaint is not accomplished, the customer may file a petition with the PSC, which will then hold a hearing on the customer's complaint, and may enter an order granting such relief as the PSC deems necessary. Furthermore, the PSC is empowered to control entry into the "interLATA interexchange" market through the "certificate" process, that is, the PSC may authorize a telecommunications company which has supplied the requisite information to supply "interLATA interexchange" service. L.B. 835, § 5 (§ 86-805). The PSC also retains the power to determine whether and when a telecommunications company may abandon or discontinue service to a local exchange area. L.B. 835, § 6 (§ 86-806).

L.B. 835 further requires that the PSC report annually to the Legislature and suggest additional legislation, if any, which may accomplish the goals of the act. L.B. 835, § 4 (§ 86-804).

The Legislature has not abandoned or abolished all PSC

regulation of telecommunications companies. Rather, through L.B. 835, the Legislature has restricted or limited the regulatory power of the PSC concerning rates and has provided a means by which the system of limited rate regulation may be evaluated by the Legislature. L.B. 835, § 4 (§ 86-804). The act preserves the PSC's regulatory jurisdiction regarding quality of service and entry into the telecommunications market and, therefore, does not divest the PSC of its regulatory power over telephone companies. The provisions in L.B. 835 concerning rate review in the various telecommunications markets are specific legislation rather than general. We therefore hold that L.B. 835 constitutionally divests the PSC of rate review jurisdiction over intraLATA interexchange and interLATA intrastate telephone service, and constitutionally limits PSC rate review jurisdiction over local exchange service rates.

L.B. 835 does not violate Neb. Const. art. IV, § 20, by nullifying PSC jurisdiction over telecommunications companies. Rather, the act constitutes specific legislation prescribing the method and manner in which the PSC will exercise its regulatory activities concerning telephone companies. The district court correctly concluded, and we also conclude, that L.B. 835 is specific legislation which constitutionally restricts the PSC's regulatory power pursuant to the Nebraska Constitution.

### PROCEDURAL DUE PROCESS FOR TELEPHONE SUBSCRIBERS

The Attorney General also contends that L.B. 835 unconstitutionally denies due process to telephone subscribers regarding PSC proceedings for review of a telephone company's rates and maintains that (1) the 60 days allotted for subscribers to gather signatures necessary to challenge a proposed rate is constitutionally insufficient and that (2) the 90-day period prescribed between the ratepayers' filing a complaint and the PSC's hearing does not provide adequate time for subscribers to prepare opposition to the rate proposal. See L.B. 835, § 3(3) (§ 86-803(3)).

Setting a rate for a common carrier is a legislative act. *Nebraska Limestone Producers Assn. v. All Nebraska*

*Railroads*, 168 Neb. 786, 97 N.W.2d 331 (1959); *Bard v. Cox Cable of Omaha, Inc.*, 226 Neb. 880, 416 N.W.2d 4 (1987). On the ground that a legislatively determined rate was "confiscatory" or "unreasonable, arbitrary and capricious," courts have invalidated rates set for a common carrier. Before 1975, only common carriers had successfully challenged rates which denied a reasonable return on investment in the carrier. See, *Kansas-Nebraska Nat. Gas Co., Inc. v. City of Sidney*, 186 Neb. 168, 181 N.W.2d 682 (1970); *Myers v. Blair Tel. Co.*, 194 Neb. 55, 230 N.W.2d 190 (1975); *Reimer v. K N Energy, Inc.*, 223 Neb. 142, 388 N.W.2d 479 (1986).

Beginning with *Myers, supra*, this court has recognized an apparent species of protectable property interest in ratepayers relative to common carriers. In *Myers*, Blair Telephone Company appealed from the PSC's order that the company lower its rates and partially return overcharges attributable to the company's inadequate service. The company challenged the new rate on the ground that it was "confiscatory so as to deprive the utility of property without compensation." *Myers v. Blair Tel. Co., supra* at 62, 230 N.W.2d at 195-96. The court held that the PSC cannot set a confiscatory rate applied to the common carrier and further noted:

> As a corollary thereto, however, neither should the utility be permitted to confiscate the ratepayers' fees without giving the reasonably adequate service for which those rates were set. The commission can no more permit the utility to have confiscatory rates for the service it performs than it can compel a utility to provide service without just and equitable compensation. As a matter of elemental justice, consumers of utility services are entitled to the same protection against confiscation of property or arbitrary action on the part of the utility as are the utilities.

*Id*. at 62, 230 N.W.2d at 196. Unfortunately, the *Myers* court did not indicate the particular constitutional or statutory right of a customer protected against a common carrier's "confiscatory" rate. The court's focus in *Myers* on confiscation of property, however, suggests that the right to a fair and reasonable rate of return may have been based on the "takings clause" of the U.S. Constitution. U.S. Const. amends. V and

XIV. See, also, Neb. Const. art. I, § 21.

The protection afforded telephone ratepayers in *Myers* was extended to natural gas customers in *Reimer v. K N Energy, Inc., supra*, when ratepayers of a natural gas company, which was the franchised supplier of natural gas for the city in which the ratepayers lived, challenged the company's imposition of a $4 per month minimum customer service charge. After the district court sustained the gas company's demurrer (subject matter jurisdiction, plaintiff's lack of capacity to maintain the suit, and failure to state a cause of action) and dismissed the action, the ratepayers appealed. In upholding jurisdiction over the dispute, this court reversed and, after citing *Myers v. Blair Tel. Co., supra,* held that

> just as the district court has the power to protect a supplier of natural gas from municipal action which deprives it of a fair, reasonable, and compensatory rate, so, too, does the district court have the power to protect a consumer of such gas from an arbitrary, unreasonable, and confiscatory rate.

*Reimer v. K N Energy, Inc., supra* at 145, 388 N.W.2d at 482.

In neither *Myers* nor *Reimer* did this court rely on a lack of procedural due process as the basis for a ratepayer's challenge to a common carrier's rate, but did recognize protection against a confiscatory rate notwithstanding that a ratepayer has had the opportunity to be heard in opposition to the rate set. Thus, after *Myers* and *Reimer*, the protection in Nebraska against a confiscatory rate seemed more a matter of substantive due process than procedural due process.

The only Nebraska decision involving due process concerns regarding "ratepayers' rights" is *Bard v. Cox Cable of Omaha, Inc., supra*. Cox Cable had been granted a franchise by the city to supply the city's residents with cable television services. Bard, a subscriber of cable television service, brought suit and claimed that the cable television rates set by the city, and accordingly charged by Cox Cable, were excessive. The district court sustained demurrers (subject matter jurisdiction) filed by the city and Cox Cable, and, after dismissal of the action on account of the demurrers, Bard appealed. We summarized Bard's challenge to the rates approved by the city:

Bard further alleges, however, that Cox Cable's rates violate the due process clause of the 14th amendment to the U.S. Constitution and several provisions of the Nebraska Constitution, including the due process clause contained in article I, § 3, thereof. The constitutional argument she makes limits itself to those due process clauses, and we, therefore, likewise limit our analysis to due process concerns.

Because the setting of rates for a regulated industry is a legislative act, the courts of this state lack the power to set rates. [Citation omitted.] The courts do, however, have the power to review legislatively set rates to determine whether they are so arbitrary and unreasonable as to be confiscatory and thus *unconstitutionally take property without due process of law*. [Citations omitted.]

Thus, in the absence of overriding federal law, the district court possesses subject matter jurisdiction to determine whether Cox Cable's rates are so arbitrary and unreasonable as to be confiscatory.

(Emphasis supplied.) *Bard v. Cox Cable of Omaha, Inc.*, 226 Neb. 880, 886, 416 N.W.2d 4, 8 (1987). After holding that federal law did not preclude a state court's review of Cox Cable's rates, this court analyzed the allegations in Bard's petition and concluded that the allegations

support an inference that Cox Cable's subscribers are paying a rate which includes a charge for something that is not being delivered to them and that, to that extent, the rate is arbitrary and unreasonable such as to be confiscatory and therefore in violation of the due process clauses of the state and federal Constitutions.

226 Neb. at 889, 416 N.W.2d at 10.

In *Bard*, however, we did not definitively characterize the due process concern as procedural or substantive. The analysis in *Bard* seems to focus on the content of the legislative enactment, that is, rates set by the city, rather than the procedure by which the rates were set inasmuch as Bard's claim did not relate to an alleged lack of notice, or a denial of an adequate opportunity to oppose the rate, but did relate to an imposed rate alleged to be unreasonable and confiscatory.

Although telephone subscribers undoubtedly have the right to be free from "arbitrary, unreasonable, and confiscatory" rates when state action is required for implementation of those rates, we interpret that right as a substantive limitation on the power of the governmental entity exercising the ratesetting function. Thus, the state is not entitled to set a rate for telephone service which effectuates a taking of property without just compensation, whether the property taken belongs to a telephone company or to a subscriber. As a trio of decisions concerning "ratepayers' rights," *Myers*, *Reimer*, and *Bard* do not relate to procedural due process in rate regulation. However, by reason of those decisions, ratepayers have a legitimate claim of entitlement to reasonable rates for telecommunications service supplied to the ratepayers. See *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972):

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

Thus, a ratepayer's right to a fair and reasonable rate, a right which has emerged from the decisions of this court, is properly classified as a "property" entitlement protected by the due process clauses of the U.S. and Nebraska Constitutions. See *Board of Regents v. Roth, supra.*

Our holding that ratepayers have a constitutionally cognizable property entitlement to reasonable telephone rates, when government involvement is necessary to implement those rates, resolves only the threshold issue whether the due process clause is applicable to the facts of this case. The question remains: What process is due? Before L.B. 835, our decisions made clear that the ratesetting authority of the PSC is legislative in character, which, if properly exercised, has the effect of a

statute on the subject of reasonable rates. *Nebraska Railroads of Omaha v. Nebco, Inc.*, 194 Neb. 322, 231 N.W.2d 505 (1975); *United Mineral Products Co. v. Nebraska Railroads*, 175 Neb. 285, 121 N.W.2d 492 (1963).

If the PSC's ratemaking authority remains legislative in nature after enactment of L.B. 835, customers have no due process right to notice and hearing on ratemaking as a legislative function. "There is no constitutional due process requirement of notice and hearing applicable to legislative matters." *Barnett v. Boyle*, 197 Neb. 677, 679, 250 N.W.2d 635, 637 (1977). The rationale underlying a refusal to recognize a constitutional right to notice and hearing in legislative matters was first expressed by the U.S. Supreme Court in *Bi-Metallic Co. v. Colorado*, 239 U.S. 441, 445, 36 S. Ct. 141, 60 L. Ed. 372 (1915), when Justice Holmes, speaking for the Court, stated:

> Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.

Accord, *United States v. Florida East Coast Railway Co.*, 410 U.S. 224, 93 S. Ct. 810, 35 L. Ed. 2d 223 (1973); *Bowles v. Willingham*, 321 U.S. 503, 64 S. Ct. 641, 88 L. Ed. 892 (1944). Only governmental decisions adjudicative in nature are subject to the procedural due process requirement of notice and hearing; legislative action is exempt from the constitutional protection of procedural due process. *Horn v. Cty. of Ventura*, 24 Cal. 3d 605, 156 Cal. Rptr. 718, 596 P.2d 1134 (1979).

> It is most common for the government to affect the life, liberty or property interest of a great number of people through its legislative functions. When the legislature passes a law which affects a general class of persons, those persons have all received procedural due process—the

legislative process. The challenges to such laws must be based on their substantive compatibility with constitutional guarantees. Similarly, an administrative agency may make decisions that are of a legislative or general rulemaking character. When an agency promulgates generalized rules there is no constitutional right to a hearing for a specific individual. However when the agency makes rules that might be termed adjudicative in that they affect a very defined group of interests, then persons representing those interests should be granted some fair procedure to safeguard their life, liberty or property.

J. Nowak, R. Rotunda, & J. Young, Constitutional Law § 13.8 at 485 (3d ed. 1986). See, also, *United States v. LULAC*, 793 F.2d 636, 648 (5th Cir. 1986) ("When the legislature enacts a law, or a state agency adopts a regulation, that affects a general class of persons, all of those persons have received procedural due process by the legislative process itself and they have no right to individual attention"). See, further, *Nolan v. Ramsey*, 597 F.2d 577 (5th Cir. 1979).

In *City of Scottsbluff v. United Tel. Co. of the West*, 171 Neb. 229, 240, 106 N.W.2d 12, 18-19 (1960), after noting the legislative nature of the PSC's ratesetting function, this court held that

no notice to plaintiff was required to be given by the commission before it acted legislatively in permitting defendant [telephone company] to revise and amend its rate rules and regulations to permit it to collect pro rata from its subscribers within the city the occupation tax imposed by the city unless a statute specifically required notice.

Thus, before enactment of L.B. 835, a telephone subscriber had no due process right to notice and hearing regarding ratemaking because the PSC's action in setting rates was classified as a legislative function.

The Attorney General concedes that the PSC's function in ratemaking before L.B. 835 was legislative. The Attorney General contends, however, that the changes in PSC review effectuated by L.B. 835 have altered the nature of the PSC's

role in the rate regulation process. We disagree. L.B. 835 merely prescribes the situations in which the PSC will perform its ratemaking function, and does not modify the nature of the inquiry made by the PSC in rate cases before the commission. Both before and after enactment of L.B. 835, the PSC's function in ratemaking is to determine what rates are "fair, just, and reasonable." L.B. 835, § 3(3), (4), and (7) (§ 86-803(3), (4), and (7)). As a result of L.B. 835, the fact that the PSC performs its ratemaking function only in limited circumstances does not affect or change the legislative character of the PSC's power. Because a reasonable rate, determined by the PSC, affects a large number of Nebraska citizens, and not a rather limited number of specifically identifiable individuals, the PSC's activity is properly characterized as legislative. Furthermore, the PSC's determination of a reasonable rate does not resolve a past dispute between identified parties. Rather, PSC determination of a reasonable rate merely sets a rate for the future. Whether activated by the PSC itself, by a telecommunications company, or by a company's subscribers, the PSC's ratemaking power remains legislative under L.B. 835.

The Attorney General next contends that L.B. 835 grants subscribers a right to notice and hearing regarding rates, a right which must comport with the constitutional concept of due process. In *State v. Kelley*, 198 Neb. 805, 809, 255 N.W.2d 840, 843 (1977), we held that although a criminal defendant has no due process right to an appeal, "when the Nebraska Constitution grants appeal as a matter of right, the procedure afforded must accord with the federal constitutional concepts of due process." See *Griffin v. Illinois*, 351 U.S. 12, 76 S. Ct. 585, 100 L. Ed. 891 (1956) (a state-granted right must be accorded due process protection). While *Kelley* and *Griffin* concerned due process in criminal matters, the principle announced in those cases seems equally compelling in civil cases. We therefore hold that where the state grants its citizens a statutory right to notice and hearing on a matter or in a proceeding, the state, in making legislative determinations affecting a citizen's property right, must adhere to a procedure which comports with the requirements of the due process clauses of the U.S. and Nebraska Constitutions.

In the present case, the due process clauses of the state and federal constitutions did not obligate the Legislature to grant telecommunications subscribers notice and hearing for a rate determination by the PSC. However, when the state conferred the right to notice and hearing regarding the ratemaking process, the Legislature was obligated to assure that such process is fundamentally fair and meaningful. The Attorney General contends that L.B. 835 offends due process by unfair time limits in the 60-day period for obtaining signatures on a petition to trigger subscriber-initiated ratemaking by the PSC and in the 90-day hearing after the subscriber's petition has been filed or a telecommunications company has filed an application for a rate increase in excess of 10 percent. See L.B. 835, § 3(3) (§ 86-803(3)).

> " ' "* * * The due process clause does not guarantee to a citizen of a State any particular form or method of state procedure. Its requirements are satisfied if he has reasonable notice, and reasonable opportunity to be heard and to present his claim or defence, due regard being had to the nature of the proceedings and the character of the rights which may be affected by it." . . .' "

*Hroch v. City of Omaha*, 226 Neb. 589, 591, 413 N.W.2d 287, 288 (1987) (quoting *Webber v. City of Scottsbluff*, 155 Neb. 48, 50 N.W.2d 533 (1951)).

We believe that the procedure outlined in L.B. 835 provides an adequate opportunity for telecommunications customers to protect their property entitlement to a reasonable telecommunications rate through subscriber participation in the PSC ratemaking hearings. For the two largest telecommunications suppliers in Nebraska, namely, NWB and LT&T, the 60-day petition process for subscriber initiation of PSC review requires that customers daily obtain 115 signatures on the petition pertaining to NWB and 88 signatures on the petition pertaining to LT&T. Given the availability of potential signatories, that is, all the telecommunications subscribers affected by the proposed rate, the Attorney General has failed to demonstrate that the 60-day time limit is unreasonable in the constitutional context of due process.

Also, the Attorney General has failed to demonstrate that

the 90-day period is inadequate for preparation of ratepayer opposition to be presented at the PSC hearing. Due to the legislative nature of the PSC's ratemaking task, L.B. 835, as a matter of constitutional consideration, need not confer on ratepayers a right to present evidence or relevant information at the PSC hearing. Notwithstanding the complexity of issues frequently involved in a rate case before the PSC, the 90-day period is ostensibly sufficient for taxpayers to gather information to challenge a telephone company's proposed rate and, therefore, gives consumers a "reasonable opportunity to be heard" and present their opposition to the proposed rate. Combined with the 60-day period to gather signatures, a consumer group could have as much as 5 months to prepare for the PSC rate hearing. Furthermore, the PSC has authority to require a telecommunications company to submit its financial reports, which would undoubtedly facilitate inquiry into reasonableness of the rates proposed by the telecommunications company. In view of the PSC's role in protecting the public interest by assuring that the rates are "fair, just, and reasonable," we are unable to conclude that the 90-day period prescribed by L.B. 835 unconstitutionally deprives telecommunications subscribers of due process. Neither the U.S. Constitution nor the Nebraska Constitution requires that telecommunications subscribers be granted any additional procedural protection beyond that embodied in L.B. 835. The Attorney General's claim that L.B. 835 violates telephone subscribers' due process rights is, therefore, without merit.

### L.B. 835 AND THE STATE'S POLICE POWER

The Attorney General's final contention is that L.B. 835 is unconstitutional because the act bears no real or substantial relationship to the general health, morals, or welfare of the public, and, therefore, is not a valid exercise of the state's police power.

> The police power is an attribute of state sovereignty, and, within the limitations of state and federal Constitutions, the state may, in its exercise, enact laws for the promotion of public safety, health, morals, and

generally for the public welfare. [Citation omitted.] Measures adopted by the Legislature to protect the public health and secure the public safety and welfare must have some reasonable relation to those proposed ends. [Citation omitted.]

*Finocchiaro, Inc. v. Nebraska Liq. Cont. Comm.*, 217 Neb. 487, 489, 351 N.W.2d 701, 703 (1984). Thus, when a fundamental right or suspect classification is not involved in legislation, a legislative act is a valid exercise of a state's police power if the act is reasonably related to a legitimate governmental interest. See *People v. Pharr*, 696 P.2d 235 (Colo. 1984).

The language of a legislative enactment may provide a manifest indication of the objective to be achieved through the legislation. See *Schaffer v. City of Omaha*, 197 Neb. 328, 248 N.W.2d 764 (1977). However, with or without an expression of the legislatively avowed objective, a court has the duty to determine whether the Legislature has exercised the state's police power in a manner reasonably related to the general health, morals, or welfare of the state's citizens. If the legislative enactment furthers a governmental interest in the well-being of the citizenry, the act must be upheld regardless of whether the Legislature contemplated the exact nature of the benefit accorded by the legislation.

The Attorney General has made no argument that L.B. 835 endangers a fundamental right or results in a suspect classification. Therefore, the act is a valid exercise of police power if the legislation is reasonably related to the general welfare of the people of Nebraska.

Without again setting forth in detail the conflicting testimony of the two economic experts presented by each side, we find that L.B. 835 is reasonably related to legitimate governmental interests of the State of Nebraska. Dr. Alessio's testimony indicates that Nebraska's regulatory structure before L.B. 835 did not provide existing telecommunications companies with the pricing flexibility needed to respond to an increasingly competitive market. Without this flexibility, telecommunications companies would likely lose, and in fact have lost, revenue previously derived from a number of their

larger subscribers. Furthermore, L.B. 835 allows the PSC to "limit, remove, or waive regulatory requirements for telecommunications companies when it determines that competition will serve the same purposes as public interest regulation." L.B. 835, § 7 (§ 86-807).

A legislature has discretion in determining what measures are reasonably necessary to protect public health, safety, and welfare, and, in reviewing a legislative act, a court should not substitute its own judgment for that of the Legislature merely because the court may believe that the Legislature acted unwisely or improvidently. See *State v. Yu*, 400 So. 2d 762 (Fla. 1981). By enacting L.B. 835, the Legislature has made a policy pronouncement that the flexibility of free competition is sometimes preferable to regulation as a method of controlling telecommunications rates. We cannot say that this conclusion is so fundamentally flawed as to constitute an unconstitutional exercise of the state's police power.

## CONCLUSION

The Attorney General has failed to demonstrate the unconstitutionality of L.B. 835. The legislation does not contravene Neb. Const. art. IV, § 20, nor does the act facially deny due process of law for telecommunications customers. Finally, the act is a valid exercise of the state's police power. Therefore, we conclude that L.B. 835 is constitutional in all challenged respects. Consequently, the judgment of the district court is affirmed.

AFFIRMED.

GRANT, J., dissenting.

I dissent. Laissez-faire may be an acceptable doctrine in some theories of government regulation, but I do not think the Nebraska Constitution permits that approach to setting rates for telecommunications companies in Nebraska.

I feel that 1986 Neb. Laws, L.B. 835, codified as Neb. Rev. Stat. §§ 86-801 et seq. (Reissue 1987), violates Neb. Const. art. IV, § 20, which provides:

> There shall be a Public Service Commission . . . . The powers and duties of such commission shall include the regulation of rates, service and general control of

common carriers as the Legislature may provide by law. But, in the absence of specific legislation, the commission shall exercise the powers and perform the duties enumerated in this provision.

A portion of § 86-803 provides: "Telecommunications companies shall not, however, be subject to any rate regulation by the commission and shall not be subject to provisions as to rates and charges prescribed in Chapter 75, articles 1 and 6." I believe that provision renders the whole of L.B. 835 unconstitutional.

The history of the adoption of Neb. Const. art. IV, § 20, is set out in *State ex rel. State Railway Commission v. Ramsey*, 151 Neb. 333, 37 N.W.2d 502 (1949). Included in that history is the court's conclusion:

> The language finally adopted [in the Nebraska Constitution] positively provides that the powers of the commission shall include the regulation of all the enumerated matters with the right of the Legislature to control the manner in which the commission shall perform its independent constitutional duties, or to enter the field itself to the extent of "specific legislation." The conclusion is logical, if not inescapable, that the Legislature would not have proposed, and the people would not knowingly have approved, an addition to the Constitution creating a commission with power only to regulate and control common carriers to the extent and for the time provided or permitted by the Legislature . . . .

151 Neb. at 343, 37 N.W.2d at 508.

In construing the meaning of "general" and "specific" as used in Neb. Const. art. IV, § 20, the *Ramsey* court stated: "It was not intended by the use of these words to authorize unlimited, broad, general legislation in reference to the control and regulation of common carriers." 151 Neb. at 344, 37 N.W.2d at 509.

In my judgment, L.B. 835 constitutes unlimited, broad, general legislation in purporting to free telecommunications companies from any rate regulation.

The *Ramsey* opinion referred to *State, ex rel. Missouri P. R. Co., v. Clarke*, 98 Neb. 566, 153 N.W. 623 (1915). In that case,

the Legislature, by statute (commonly called the "Two-cent Fare Act"), had fixed a maximum rate of 2 cents per mile for railroad passenger rates and then, 21 days later, had enacted a statute granting the Legislature the power "to fix all necessary rates, charges and regulation to govern and regulate the freight and passenger tariffs of railway companies . . . ." Rev. Stat. § 6109 (1913). The relator contended the later statute authorized the commission to raise the rates beyond 2 cents. The *Clarke* court held to the contrary, stating: "The general power of the state railway commission, as applied to passenger traffic, is limited to rates below the maximum fixed by the two-cent fare law." 98 Neb. at 571, 153 N.W. at 625. In my opinion, this holding determines that "specific legislation," in this area of the law, is the setting of rates and not the outlawing of rate regulation.

I construe the *Ramsey* and *Clarke* cases to mean that if the Legislature preempts the rate field by setting specific rates, it has enacted the "specific legislation" referred to in article IV, § 20. In my judgment, the authority to set a specific rate does not extend the authority of the Legislature to say "no one shall regulate rates." In their Constitution, the people of the State of Nebraska have expressed their decision that either the Legislature or the commission shall regulate the rates of common carriers. I do not believe that constitutional directive can be thwarted by legislative action abolishing rate regulations as to specific common carriers.

In enacting §§ 86-801 et seq., the Legislature has attempted to repeal Neb. Const. art. IV, § 20. I do not believe the Legislature can do that. I would reverse the judgment of the trial court and hold that §§ 86-801 to 86-811 are unconstitutional as violating Neb. Const. art. IV, § 20.

BOSLAUGH, J., joins in this dissent.